[Crim. No. 6022. First Dist., Div. One. Feb. 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JULIAN
KATZMAN et al., Defendants and Appellants.

Stephen Grant, under appointment by the Court of Appeal, and George G. Walker for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Jerome C. Utz, Deputy Attorneys General, for Plaintiff and Respondent.

· MOLINARI, P. J.—After a jury trial, defendant Katzman was convicted of one count of conspiracy, four counts of grand theft, and seven counts of forgery; and defendant Sahati was convicted of one count of conspiracy, one count of

grand theft, and four counts of forgery. Both defendants appeal. Katzman claims that there was a material variance between the indictment, which alleges a single conspiracy, and the proof, which he contends establishes multiple conspiracies; that the trial court erred in failing to instruct the jury *sua sponte* that "willful ignorance" of the victims constitutes consent and that a defendant is not liable for offenses committed by members of the conspiracy before he joined it or after he withdrew from it; and that there was an illegal search of his living quarters. Sahati claims that he was denied his constitutional right to a speedy trial and that the trial court should have instructed the jury *sua sponte* that his attempts at repayment of various allegedly fraudulently obtained loans were evidence that he lacked the intent to defraud. We have concluded that there is no merit to any of these contentions.

### Facts

Sahati is a business man who before his trial in this case was engaged heavily in stock market activities and other business ventures. He had borrowed and repaid hundreds of thousands of dollars from at least 12 separate banking institutions in San Francisco over the 11-year period preceding the instant trial. Katzman, Sahati's business acquaintance, was 31 years old at the time of trial and had worked for several stock brokerage houses. So far as the record shows neither defendant has a record of prior criminal offenses.

Both defendants obtained numerous loans from many San Francisco banks and lending institutions using as collateral stock certificates of a defunct Nevada corporation, Pacific Coast Properties, Inc., on which certificates were forged the names of two officers of a Delaware corporation of the same name. Both defendants represented to the lenders that the stock was listed on the American Exchange, whereas in truth the stock listed on the American Exchange was that of the Delaware corporation.

Robert W. Wilson, one of the original incorporators of the Nevada corporation and a business acquaintance of Sahati, testified that the Nevada corporation was incorporated in 1959 in Reno and had its charter revoked in 1961. No stock was ever issued in that company. Certificates representing about 90,000 shares were signed by Lawrence Keller (the second incorporator) and made out to Thomas Willer (the third incorporator) and were kept in Wilson's San Francisco office. Wilson's secretary once saw Sahati in Wilson's office.

Neither defendant denied using the forged stock to obtain the loans charged. Sahati testified that Katzman had loaned him the stock and that he believed the certificates represented shares in the Delaware corporation listed on the American Exchange. Sahati stated that he promised Katzman not to sell the certificates for purposes of saving capital gains taxes, but that he never knew the stock was worthless until a bank official notified him of that fact on September 31 [sic], 1965. He then destroyed the certificates.

Katzman testified that he obtained all the stock certificates from his roommate, Robert Wilcox, and that he did not know where Wilcox got the stock or the money to buy the stock. He further stated that he loaned the stock to Sahati for a fee. According to Katzman, Wilcox gave him thousands of shares of Pacific Coast Properties, Inc. stock worth between $150,000 and $210,000.

Wilcox, who was Katzman's roommate beginning in October of 1964, testified that he never filled in the stock certificates and never loaned Katzman more than $25, and that he knew nothing about Katzman's transactions with the stock. In his capacity as a cashier for E. F. Hutton & Co., he guaranteed for Katzman certain signatures on alleged transfers of the false stock from one L. H. Mann to Katzman, but he never guaranteed the stock itself. Wilcox found stock certificates of the Nevada corporation in his and Katzman's apartment and turned these over to the police after the fraud was discovered.

The fraud was discovered after Sahati, on August 30, 1965, obtained a $45,000 loan from the Fireside Thrift Company in San Francisco on the security of six certificates of stock in Pacific Coast Properties, Inc. A bank official discovered that the certificates were not regular by calling the treasurer of the true Pacific Coast Properties, Inc. and also contacting the Nevada Secretary of State. The official informed Sahati that the stock was spurious and requested repayment of the loan. Sahati came to the bank and tendered cashier's checks for $25,000 and $8,000 and some postdated promissory notes.

There is evidence that Sahati had been making repayments on some of the allegedly fradulently obtained loans. For example, he repaid $8,000 to the Bank of America, Stonestown Branch, on loans totaling $28,000; $12,000, constituting payment in full, to the Morris Plan; $48,000, again payment in full, to that same institution; and $18,000, payment in full, on loans from the Golden Gate National Bank. So far as the record shows, Katzman only repaid $2,500 on loans totaling upwards of $70,000.

Other facts material to the issues raised on these appeals will be noted later as they become relevant to the contentions of the parties.

### Katzman's Appeal

*Was there a material variance between the indictment and the proof?*

*No.* A criminal conspiracy may be established by showing that there was an agreement between two or more persons to commit a crime, accompanied by some overt act in furtherance of the objects of the conspiracy. (*People* v. *Aday* 226 Cal.App.2d 520, 533 [38 Cal.Rptr. 199]; *People* v. *Jones,* 228 Cal.App.2d 74, 83 [39 Cal.Rptr. 302].) The existence of the agreement may be shown by circumstantial as well as by direct evidence. (*People* v. *Aday, supra,* at p. 534; *People* v. *Massey,* 151 Cal.App.2d 623, 651-652 [312 P.2d 365].)

It is not necessary that the overt act be criminal; it may be committed by one of the conspirators, and when so committed all members of the conspiracy are bound by such act. (*People* v. *Aday, supra,* at pp. 533-534; *People* v. *Sica,* 112 Cal.App.2d 574, 581 [247 P.2d 72]; *People* v. *Buffum,* 40 Cal.2d 709, 725 [256 P.2d 317].)

In the present case the indictment charges that Katzman, Sahati, and Charles H. Shaw,[1] during the period from November 24, 1964 to September 22, 1965, conspired and agreed together to commit grand theft and forgery. Seven overt acts were charged. At the trial the evidence developed that during the period charged in the indictment Katzman loaned or gave the stock to Sahati. The loans obtained by both Katzman and Sahati on this stock were close in time and very numerous; and they both made similar representations to the defrauded banks. The jury could reasonably infer from the foregoing evidence that Katzman and Sahati conspired together to defraud various lending institutions by passing the fraudulent stock off as genuine. Substantial evidence of each of the seven overt acts alleged in the indictment was introduced. It is not contended that this evidence was insufficient. Accordingly, the proof corresponded with the allegations of the accusatory pleading and shows one conspiracy whereby Katzman supplied the Pacific Coast Properties, Inc. stock and Katzman and Sahati both obtained loans on the

---

[1]Shaw was acquitted of the conspiracy count but was convicted on other counts. He filed a notice of appeal, but his appeal was subsequently dismissed.

784

stock representing it as the stock of the company listed on the American Stock Exchange.

Defendant's reliance upon *Kotteakos* v. *United States*, 328 U.S. 750 [90 L.Ed. 1557, 66 S.Ct. 1239] is misplaced. There the evidence clearly showed that there was not a single general conspiracy but eight or more different ones of the same sort executed through a common key figure, Simon Brown. There was no connection between the petitioners and the other defendants other than that Brown had been the instrument in each instance for obtaining the loans. In the present case there was sufficient evidence of a connection and relationship between Katzman and Sahati.

We note, moreover, that defendant did not claim uncertainty in the indictment by special demurrer in the trial court, nor does he show any prejudice now. If there is a variance it is immaterial. A variance is not regarded as material unless it is of such a substantive character as to mislead the accused in preparing his defense, or is likely to place him in danger of being twice put in jeopardy for the same offense. (*People* v. *Williams*, 27 Cal.2d 220, 225-226 [163 P.2d 692]; *People* v. *La Marr*, 20 Cal.2d 705, 711 [128 P.2d 345]; *People* v. *Jones, supra*, 228 Cal.App.2d at p. 88; see *People* v. *Galloway*, 233 Cal.App.2d 369, 371 [43 Cal.Rptr. 617]; and see Pen. Code, § 960.[2]) In the instant case defendant does not claim that he was misled in the preparation of his defense or that he is likely to be placed in second jeopardy for the same offense.

The gist of defendant's argument appears to be that because the evidence does not show joint participation by him and Sahati in the various loan transactions there could not be a single conspiracy. "The essence of the crime of conspiracy is the 'evil' or 'corrupt' agreement to do an unlawful act. It is the evil intent that makes a combination criminally indictable." (*People* v. *Marsh*, 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300].) "It is not necessary that a party to a conspiracy shall be present or personally participate with his co-conspirators in all or in any of the overt acts." (*People* v. *Benenato*, 77 Cal.App.2d 350, 356 [175 P.2d 296] [overruled on different point, *In re Wright*, 65 Cal.2d 650, 654-655 [56 Cal.Rptr. 110, 422 P.2d 998] (fn. 3 and accompanying text)]; *People* v. *Aday, supra*, 226 Cal.App.2d at pp. 533-534.) In the

[2]All statutory references hereinafter made are to the Penal Code unless otherwise indicated.

present case the several loan transactions were charged and proved as overt acts.

*Did the court err in failing to instruct the jury sua sponte that "willful ignorance" of the victims constitutes consent?*

■ *No.* There is no evidence in this record that the lending institutions consented to use fraudulent stock as security for their loans to Katzman and Sahati. There is ample evidence that these institutions relied on the representations made by Katzman and Sahati that the stock was that of a Delaware corporation listed on the American Exchange. There is also evidence that the banks would not have made the loans if they had known that the stock was not genuine. In any event, an instruction on "willful ignorance" would not have been proper even had Katzman requested it. Ignorance or negligence of the victim is not a defense to theft by false pretenses. (*People* v. *Cummings*, 123 Cal. 269, 272 [55 P. 898]; *People* v. *Phillips*, 186 Cal.App.2d 231, 239 [8 Cal.Rptr. 830]; *People* v. *Gilliam*, 141 Cal.App.2d 749, 751-752 [297 P.2d 468].)

*Did the court err in failing to instruct sua sponte that a defendant is not liable for offenses committed by members of a conspiracy before he joined the conspiracy or after he withdrew from it?*

■ *No.* First, there is no evidence that Katzman withdrew from the conspiracy nor is there any evidence of criminal acts committed by the codefendants before Katzman joined the conspiracy.

Katzman claims that the evidence shows that he was in Switzerland when the criminal transactions took place. According to his testimony he was in Switzerland between May 15, 1965 and June 30, 1965. There was ample evidence that the conspiracy was entered into prior to May 15, 1965 and that it continued after June 30, 1965. No overt acts on the part of any of the co-conspirators in furtherance of the conspiracy were alleged or proved as having occurred during the time Katzman was in Switzerland. In any event, as already pointed out, once the conspiracy was formed Katzman was liable for the acts of co-conspirators even if he himself was not present when overt acts were committed by them. Moreover, as to the overt acts charged and proved as having been committed by Katzman the evidence abundantly shows his personal participation at times prior and subsequent to his sojourn in Switzerland. It is significant, moreover, to note

that the trial court properly instructed the jury concerning liability for the acts of co-conspirators and withdrawal from a conspiracy.[3]

*Was Katzman the victim of an illegal search and seizure?*

■ *No.* Katzman contends that the evidence shows an illegal private search of his apartment conducted by a Wells Fargo agent by and through Wilcox, his cotenant. The evidence reveals the following facts. An attorney for E. F. Hutton contacted Wilcox after the fraud had been discovered and told him that there was trouble and that he should cooperate in every manner. Later, while Wilcox was cleaning up the apartment in the belief that Katzman was not coming back, he found a certificate of Pacific Coast Properties, Inc. in Katzman's dresser drawer, and a book of stock certificates in a cardboard box in Katzman's closet. Wilcox had seen the book of certificates earlier while washing clothes. Wilcox testified that he never talked to any police officers prior to turning in the certificates. Katzman objected to the admission into evidence of the foregoing testimony.

The foregoing evidence was admissible. The rule that evidence obtained in violation of constitutional guarantees against unreasonable searches and seizures is inadmissible does not apply to evidence obtained by a private person not employed by or associated with a governmental unit or agency. (*People* v. *Johnson,* 153 Cal.App.2d 870, 873 [315 P.2d 468]; *People* v. *Randazzo,* 220 Cal.App.2d 768, 775 [34 Cal.Rptr. 65].) In the instant case there is no indication that Wilcox was acting under the direction of any law enforcement officer or government unit or agency. Moreover, even if Wilcox's actions violated Katzman's rights of privacy in the apartment, there is no possibility whatsoever that Katzman could have been prejudiced by Wilcox's testimony in view of the fact that Katzman admitted possessing and passing the stock and negotiating loans on the basis of the stock. Katzman relied solely on his alibi that Wilcox gave him the stock. Therefore, the fact that certificates of Pacific Coast Properties, Inc. were found in Katzman's possession cannot have

---

[3]The trial court instructed as follows: "A person who joins a conspiracy after its formation is not liable or bound by the acts of the co-conspirators or for any crime committed by the co-conspirators before such person joined and becomes a member of the conspiracy.

"Any member of a conspiracy may withdraw from, and thereafter cease to be a party to, the unlawful confederacy and may thus terminate his liability as to all future acts of the conspiracy, . . ."

prejudiced his defense, since he essentially admitted his possession thereof. ■ The admission of illegally seized evidence is not reversible error per se. (See e.g., *People* v. *Parham,* 60 Cal.2d 378, 385-386 [33 Cal.Rptr. 497, 384 P.2d 1001] ; *People* v. *Tarantino,* 45 Cal.2d 590, 596, 601 [290 P.2d 505].)

### *Sahati's Appeal*

*Was Sahati denied his right to a speedy trial?*

■ *No.* Sahati contends that he was denied his rights to a speedy trial (§§ 1050 and 1382; Cal.Const., art I, § 13) when his case was continued beyond March 14, 1966 on which date the following events took place.[4] Katzman's attorney requested a continuance in order to make further discovery. The public defender, representing the third defendant, Shaw, joined in the motion, stating that he was not ready for trial because he had only been appointed four days prior, due to a substitution of attorneys, and had just gotten a copy of the transcript that day. Sahati's counsel vigorously opposed a continuance and referred to an earlier request for severance of the trials. Sahati did not indicate specific prejudice that would result from a continuance but alleged general impairment of his credit and of his ability to raise money, and complications of his life and his business. The court pointed out that severance would require trial of a three-week case twice. Ultimately, after granting a challenge to the jury panel (made by Katzman), the court granted a continuance until March 21, 1966. In granting the continuance, the court stated that on March 21 only jury impanelment would take place; that the judge was required to attend a Judges' Conference in Santa Barbara beginning March 28 and would not return until April 4, at which time evidence would be taken. The court then set the case for trial for March 21. The jury trial commenced on March 21 and resumed on March 22. On each of these days the trial was devoted solely to the selection of the jury. On March 22 the trial was continued to April 4. Sahati's motion to dismiss under section 1382, subdivision 2 made on March 22 was denied.

Sahati contends that the trial was in effect continued from March 14 to April 4 in violation of section 1382, subdivision 2 and that the continuance to April 4 was prejudicial because

---

[4]The indictment was filed on November 4, 1965. The case was set for trial on February 23, 1966 and continued to March 14, 1966 by consent. Sahati does not challenge the continuance to March 14.

the jury was permitted to ''roam about'' for a 13-day period (between March 22 and April 4) and might have read about the case in the newspapers during that time. He does not, however, adduce any specific evidence that such prejudicial misconduct took place.

Under section 1382, subdivision 2, a defendant has the right to be tried within 60 days after the finding of the indictment *or* within 10 days of the last date to which he consents that the cause be continued beyond the 60-day period, unless the prosecutor or the court shows good cause for further delay. (*People* v. *Wilson,* 60 Cal.2d 139, 145 [32 Cal.Rptr. 44, 383 P.2d 452].) Sahati consented to continuances beyond the 60-day period up until March 14. On that date he opposed further continuances. He was therefore entitled to be tried within 10 days of March 14, absent a showing of good cause for delay.

The case in fact went to trial on March 21, within the 10-day period. Accordingly, it would seem that he was not then entitled to a dismissal since the court had complied with section 1382.[5] Sahati argues, however, that since the court had already decided that evidence would not be taken before April 4, the court had not really set the trial for March 21 at all; that the setting of the cause to impanel the jury was merely a device to avoid the ban of section 1382; and that the trial was really set for April 4, i.e., more than 10 days after March 14.

We have found no cases on the subject of what constitutes a ''bringing to trial'' of a case for purposes of section 1382, subdivision 2. It would seem that the impaneling of the jury, which took place in this case on March 22, should constitute a bringing to trial. That event is significant in

---

[5]Certainly the continuance from March 14 to March 21 was not an abuse of discretion, in view of the recent appointment of the public defender for codefendant Shaw and his manifest need for some time to prepare himself. Weighing the inconvenience of a seven-day continuance against the alternative of severance, which would have required lengthy separate trials although the defendants were jointly charged and were mutually involved in the scheme, it is plain that the trial court did not abuse its discretion in permitting a continuance within the limitations of section 1382. (*Cf. Ferenz* v. *Superior Court,* 53 Cal.App.2d 639, 642 [128 P.2d 48]; *People* v. *McFarland,* 209 Cal.App.2d 772, 777 [26 Cal. Rptr. 596].) What constitutes good cause for a continuance rests in the discretion of the trial court and a case will not be reversed on appeal on this ground without an affirmative showing of abuse. (*People* v. *Erb,* 235 Cal.App.2d 650, 652 [45 Cal.Rptr. 503] [cert. granted, *Erb* v. *California,* 386 U.S. 273 (3-13-67) [18 L.Ed.2d 41, 87 S.Ct. 1034]; vacated and remanded for further consideration in light of *Chapman* v. *California*].)

determining when a defendant has been placed in jeopardy so that an action against him cannot be dismissed without prejudice. (*People* v. *Webb,* 38 Cal. 467, 477-480; *Jackson* v. *Superior Court,* 10 Cal.2d 350, 352, 358-359 [74 P.2d 243, 113 A.L.R. 1422]; *Paulson* v. *Superior Court,* 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641].) It is inconsistent to state that a defendant is in jeopardy when the jury has been impaneled, yet has not been brought to trial for purposes of the speedy trial requirement of section 1382. We therefore conclude that defendant Sahati was brought to trial within 10 days of March 14 and hence that the trial court complied with the mandate of section 1382.

 Since there was no violation of section 1382, the only question is whether the court erred in granting a continuance from March 22 to April 4. Section 1050 declares a policy that criminal cases shall be set for trial, heard, and determined as soon as possible, and that ''No continuance of a criminal trial shall be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance.'' Here the ground for the continuance was the judge's appointment to attend a conference. The court's schedule, however, is an insufficient excuse for delay. (See *Dearth* v. *Superior Court,* 40 Cal.App.2d 56, 59 [104 P.2d 376]; *Sigle* v. *Superior Court,* 125 Cal.App.2d 747, 748 [271 P.2d 526]; *People* v. *Echols,* 125 Cal.App.2d 810, 816-817 [271 P.2d 595]; *In re Vacca,* 125 Cal.App.2d 751, 753 [271 P.2d 162]; *Herrick* v. *Municipal Court,* 151 Cal.App.2d 804, 807 [312 P.2d 264].) No judge has an inherent right to try any particular case nor to refuse to transfer cases out of his department. (*People* v. *Echols, supra,* at p. 817.) It was therefore error for the court here to grant a continuance; it should instead have transferred the case to another department in which trial could be commenced without interruption as of March 21.

Such error is not necessarily, however, grounds for reversal. In this case Sahati does not contend that the delay in any way affected his trial. The right to a speedy trial is not a fundamental right such as the right to counsel, but rather is personal to the defendant. (*People* v. *Wilson, supra,* 60 Cal.2d at p. 148.) Even when an improper delay amounts to a violation of the mandate of section 1382, a court on an appeal from the conviction will not reverse the judgment without a show-

ing of prejudice resulting from the delay.[6] (*People* v. *Wilson, supra*, at pp. 151-152; accord: *People* v. *Clark*, 62 Cal.2d 870, 886 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Allen*, 220 Cal.App.2d 796, 800 [34 Cal.Rptr. 106].) ▮ In this case no effect of the continuance of the trial is apparent; there is no indication whatsoever that Sahati was deprived of a fair trial because of the 13-day delay. His suggestion that the jury engaged in misconduct during that period is pure speculation. Therefore whether the relevant test of prejudice is that set out in *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243], or is the test now applicable to constitutional violations by virtue of *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] it is clear that the granting of the continuance in this case is not reversible error.

*Should the trial court have instructed the jury sua sponte that attempts at repayment are evidence of lack of intent to defraud?*

▮ *No.* Sahati contends that the court committed reversible error in not instructing the jury *sua sponte* that Sahati's repayments to some of the financial institutions involved are evidence of lack of intent to defraud. Sahati agrees with the People that neither repayment to the victims nor intention to repay them deprives criminal false pretenses of their criminality (*People* v. *Wieger*, 100 Cal. 352, 357 [34 P. 826]; *People* v. *Wynn*, 44 Cal.App.2d 723, 729 [112 P.2d 979]), but contends that his repayments are evidence that he originally lacked the intent to defraud, i.e., tend to show his good faith and that he did not commit the charged offenses.

In *People* v. *Braver*, 229 Cal.App.2d 303, 307-308 [40 Cal. Rptr. 142, 10 A.L.R.3d 565], it was held that evidence of restitution, though not a defense to fraud, does tend to show that no fraud was intended. (Accord: *People* v. *Durbin*, 232 Cal.App.2d 674, 679 [43 Cal.Rptr. 60]; *State* v. *Scott*, 105 Utah 31 [140 P.2d 929, 932]; *State* v. *Mason*, 62 Mont. 180 [204 P. 358]; *State* v. *Johnson*, 195 N.C. 506 [142 S.E. 775].)

▮ The crimes charged against Sahati are specific intent crimes, that is, Sahati could not be convicted of theft by false pretenses (*People* v. *Marsh*, 58 Cal.2d 732, 736 [26 Cal.Rptr. 300, 376 P.2d 300]), of forgery of the stock certificates (*People* v. *Valdes*, 155 Cal.App.2d 613, 614 [318 P.2d 118]; *People* v. *Crowder*, 126 Cal.App.2d 578, 585 [272 P.2d 775]), or of

---

[6]The case is otherwise, of course, if a defendant brings prohibition or mandate at the outset of the trial when the reviewing court can still relieve him of the delay. (*People* v. *Wilson, supra*, at pp. 149-152.)

uttering those certificates (*People* v. *Smith*, 103 Cal. 563, 565 [37 P. 516]; *People* v. *Fork*, 233 Cal.App.2d 725, 731 [43 Cal.Rptr. 804]; *People* v. *Sinshiemer*, 182 Cal.App.2d 103, 109 [5 Cal.Rptr. 740]) without a showing that he possessed a specific intent to defraud, prejudice, or damage the lending institutions involved. Accordingly, under the principles of *Braver* Sahati was entitled to and did present evidence of his attempts at repayment of the various loans in an endeavor to convince the jury that he did not know the certificates were false and therefore lacked the requisite specific intent to defraud. The claim of defendant is not that he was prevented from offering evidence of repayment, but that the court by its instructions misled the jury into believing that Sahati's repayments were irrelevant. The instructions given by the court on the subject of repayment are set out verbatim in the footnote.[7]

The record discloses that the trial court properly defined the crimes of which Sahati was charged and that it fully instructed that specific intent was required to convict defendant of these crimes. The court also instructed that an act made under an ignorance or mistake of fact which disproves any criminal intent is not a crime.[8]

Sahati contends, however, that a further instruction was required on the specific subject of repayments. The law is that the court must on its own motion give instructions on the general principles of law involved in the case, but not on specific points developed by the evidence at trial. (*People* v. *Wade*, 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Atwood*, 223 Cal.App.2d 316, 331-332 [35 Cal.Rptr.

---

[7] "It is not a defense to a prosecution for theft that after the theft was committed complete or partial restitution was made to the owner of the stolen property or that this loss was wholly or partly recouped by other means."

"It is not a necessary element of the crime of obtaining property by false pretense that the person against whom the offense is directed suffer a pecuniary loss or permanently be deprived of his property as the final outcome of the chain of events involved. If the crime was committed by the defendant, he is not to be acquitted or excused because in the end the complaining witness suffered no property loss, if such be the case."

[8] This instruction, in its entirety, read as follows:

"An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime.

"Where a person in good faith believes in the existence of certain facts, and acts, or omits to act, with reference to such believed facts in a manner which would be lawful if the facts were really as he believes them to be, he is not guilty of a crime, although his act or omission is such that if committed or made by one who knew the true fact, it would constitute a criminal offense."

831].) The evidentiary value of Sahati's repayments is plainly a specific point developed by the evidence at this particular trial, and we therefore do not think that the court erred in failing to instruct on this subject *sua sponte,* although such an instruction would have been proper under *Braver* if requested.

 Sahati contends, however, that certain exchanges between the court and counsel tended to mislead the jury into believing that repayments were irrelevant, so that the failure to instruct on the relevance of repayments became prejudicial error. The record discloses that the comments now complained of occurred during colloquy between court and counsel at various points throughout the trial when Sahati's counsel objected to evidence of events subsequent to the loan transactions.[9] We perceive no prejudicial error in these comments. Moreover, any error in this regard was invited by counsel in view of counsel's repeated emphasis on the irrelevance of events subsequent to the loan transactions and his agreement with some of the court's comments. A party is estopped from asserting error on appeal that was induced by his own conduct. He may not lead a judge into substantial error and then complain of it. (*Jackson* v. *Superior Court,* 10 Cal.2d 350, 358 [74 P.2d 243, 113 A.L.R. 1422]; *People* v. *Davenport,* 240 Cal.App.2d 341, 346 [49 Cal.Rptr. 575]; *People* v. *Wright,* 199 Cal.App.2d 30, 38 [18 Cal.Rptr. 243].) Sahati should not be permitted to argue on appeal that the court should have instructed on its own motion on a specific evidentiary point, when Sahati's counsel is himself responsible for such possibly misleading statements on this point as occurred in the jury's presence.[10]

---

[9]At one point the court commented that ''It wouldn't make any difference whether they got the money back or not as far as the crime is concerned,'' and the prosecutor stated that what happened after the stocks were passed did not affect whether or not the crime occurred on the particular date. Sahati's counsel vehemently agreed with the latter statement. At another point, Sahati's counsel attempted to exclude testimony as to the worth of the postdated checks which Sahati gave in repayment, and the court in responding to the objection made the remark complained of: ''The question is in this case, did he receive money from this institution by putting up a stock that did not have the value that he claimed it had, and whether or not under the circumstances there is anything due?'' At still another point the court remarked that this case comes down to one point: did the defendants go to the banks and misrepresent the stock and get money, to which Sahati's counsel responded, ''I agree, your Honor.''

[10]In this connection we note that one of the court's comments complained of on appeal occurred out of the jury's presence.

In any event, in view of the court's careful and complete instruction on the subject of intent, we do not think that the omission of the instruction under discussion was prejudicial to Sahati. The court's isolated comments during the course of this three-week trial are unlikely to have misled the jury, especially since the court permitted evidence of repayments to come in and never actually stated that repayments are not evidence of lack of intent to defraud.

The judgment is affirmed as to both defendants.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied March 5, 1968, and the petition of appellant Sahati for a hearing by the Supreme Court was denied April 10, 1968. Traynor, C. J., and Peters, J., were of the opinion that the petition should be granted.