[Crim. No. 25395. Second Dist., Div. Five. Apr. 30, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT M. SILVER, Defendant and Appellant.

## Counsel

Phill Silver for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Steven H. Kaufmann, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**LORING, J.\***—Robert M. Silver (Silver) was indicted by a grand jury for violation of Penal Code section 476a (issuing a check without sufficient funds with intent to defraud) on March 27, 1973 (count I). Count II charged a violation of Penal Code section 487, subdivision 1 (grand theft of property of a value in excess of $200) on the same date. E. F. Hutton & Company (Hutton) a brokerage firm was the victim of each alleged offense. Silver entered a plea of not guilty and duly waived jury trial. After a five-day nonjury trial, the court found Silver not guilty on count I (issuing check, etc.) and guilty as charged on count II (grand theft, etc.). Silver's motion for a new trial was denied but his application for probation was granted. Proceedings were suspended prior to imposition of sentence and he was placed on probation for a period of two years on condition, inter alia, that he pay a fine of $2,000. He appeals from the judgment (order granting probation).

### Contentions

Appellant contends:

I The court erred in holding that restitution prior to the indictment did not negate intent to commit grand theft.

*Assigned by the Chairman of the Judicial Council.

II   That the taking of funds under claim of right constitutes a defense to the crime of grand theft.

III   Evidence of lack of use of funds taken is admissible to show lack of felonious intent.

IV   That a claim of title in good faith does not depend on whether claimant entertained the mere belief that he was acting legally.

V   An essential element of grand theft is intent to deprive the owner of his property wholly and permanently.

VI   The acquittal on count I was res judicata on count II.

## Facts

Silver, an attorney at law, maintained a commodities account at Hutton which was in his name. He and Rose Silver, his wife, ultimately claimed that the account had been opened with her separate funds. On March 21, 1973, about a week prior to March 27, 1973, and when the account had a net balance of about $38,000, a creditor of Silvers ran a writ of garnishment on the account for about $13,000. Silver ordered the account closed. Hutton gave Silver its check for $25,000 which was deposited in a bank account in Rose Silver's name. Hutton held the balance of $13,000 subject to the writ of garnishment. Silver repeatedly tried to persuade Hutton to release the $13,000 on a variety of legal arguments—that the money was Rose's separate property, that the money did not really exist in California, but existed only at Hutton's New York office, that there was no money in the account, only positions—all of which arguments were unsuccessful. Silver was also unsuccessful in persuading Hutton to make a deposit in court and interplead the parties. Hutton made a return to the writ that it was indebted to Silver. Rose ultimately filed a third party claim which was denied in July 1973. On March 23, 1973, Hutton's agents prevailed upon Silver to resume trading (since they had been so successful). On Tuesday, March 27, 1973, Silver and Rose Silver opened a new account with Hutton in her name. Silver then gave Hutton a check for $13,500 dated March 22, 1973, signed by Silver, drawn on an account in the name of Silver and Rose Silver at Coolidge Bank & Trust Company, Watertown, Massachusetts. The check was credited by Hutton to the new account in the name of Rose Silver. Trading was resumed in soybean oil. On Thursday, March 29, 1973, Silver called Hummel at Hutton at about 11 a.m., instructing him to close the new account and requesting a check for

the trades which had been closed out. Hummel refused to issue a check as requested by Silver until Silver's initial check, which had opened the account which was drawn on the Coolidge Bank, had cleared and been paid. Silver appeared at the offices of Hutton at 2:30 p.m., March 29, 1973, stating to a Hutton employee, James Cliffton, that he had told Hummel that he wanted to pick up the check, that he had an escrow closing, that he wanted the money, that Hummel had forgotten to draw that check. Because Silver had been a good customer of long standing, Cliffton called the margin department and requested a check. The margin department refused to issue a check because Silver's check had not cleared. Cliffton asked Silver, "Your check is good, isn't it?" Silver replied, "Yes, it is good." Cliffton then went to Mencer, the head of west coast operations for Hutton, and advised Mencer that Hutton had given Silver a check for $25,000 a few days before and that Silver assured him the check drawn on the Coolidge Bank was good. Cliffton obtained a Hutton check for $12,606 which was delivered to Silver shortly after 3 p.m. The Hutton check was cashed that afternoon by special arrangement after normal banking hours in a Crocker Bank adjacent to the Hutton office. However, the check was cashed by the bank paying $2,000 cash and a cashier's check for $10,606. The Crocker cashier's check for $10,606 was cashed on Friday, March 30, 1973. On Monday, April 2, 1973, Silver advised Cliffton that he had stopped payment on the check drawn on the Coolidge Bank. Silver told Cliffton, "Better that you get screwed than me." Tobias, operations officer for Coolidge Bank, testified that the Silver account was opened at that bank March 16, 1972, that in May 1972, the account had a balance of almost $9,000, that it had a zero balance in August 1972 and remained in that condition until the bank received a stop payment letter dated March 27, 1973,[1] directing the Coolidge Bank not to honor the check payable to Hutton in the sum of $13,500.

Silver testified in his own behalf that the money in the Hutton account was his wife's separate property, that he attempted to persuade Hutton to make a return to the writ of garnishment that it was not indebted to Silver, that he was unsuccessful in getting Hutton to release the money. Silver testified that when he gave Hutton the check for $13,500 drawn on the Coolidge Bank, he stated in the presence of Hummel and Cliffton that Mrs. Silver's money under garnishment would have to be released before the check could be paid. Silver testified that Cliffton said not to worry that they would create a debt in the new account where Silver owed Hutton fourteen thousand dollars and Hutton could use the

---

[1]Silver claimed that he back dated the letter that it was not actually sent until Friday, March 29, 1973.

garnished money (under a broker's right of offset) to pay the debt. Hummel testified that when he accepted Silver's check and opened the new account in the name of Rose Silver, he had no idea that there was no money in the Coolidge Bank to cover the check. Cliffton testified that he did not become aware that the check with which Silver opened the new account had been drawn on an out-of-state bank until he talked to Hummel the following Friday, that he never suggested that the account be opened to create a debt to offset the garnished money, that during his 14 years in the brokerage business, he had never heard of a broker's right of offset. Loren Schechter, a New York counsel for Hutton, testified to several conversations with Silver by telephone about the garnishment and various legal theories which Silver expounded which would provide a basis for Hutton to return the garnished money to Silver. Schechter also testified that in the third conversation (after Hutton was aware that Silver had stopped payment on the check drawn on the Coolidge Bank) the following occurred:

"I asked Mr. Silver to be put on the phone. He was. I asked him what was going on. He said to me, 'I am tired of having been the fuckor instead of the fuckee.'

"I said, 'You have it backwards.'

"He said, 'Yes, I mean the other way,' but that's the sum and substance of it."

Schechter also testified:

"Q. Was there a discussion about Mr. Silver opening a second account to create a debit in favor of E. F. Hutton Company to offset the claim of the garnishment, itself? Was that discussed?

"A. In the third conversation he indicated he had stopped payment on the check because he was angry with our having responded to the garnishment.

"Q. But there was a discussion about a third—a debit account created in a new account in Hutton & Company to offset the garnishment?

"A. The term offset was not used on a counterclaim or anything like that. He indicated he was very mad at us."

Hutton sent Silver a letter dated April 5, 1973, demanding return of $13,335[2] on or before 10 a.m., April 9, 1973. Silver replied by letter dated April 16, 1973, that he would not return the money and demanded the payment of an additional $600 allegedly due from Hutton to Mrs. Rose Silver. Hutton sued Silver in a civil action to recover its loss. Before the grand jury returned its indictment, Silver paid Hutton the amount of its claim. The money was repaid Hutton on February 6, 1974. Silver testified that he had deposited the money that he had acquired from Hutton in a separate bank account and did not use any portion of it for his own use and benefit.

## DISCUSSION

Silver argues that the court erred in holding that restitution prior to the indictment did not negate intent to commit grand theft. As we read the record the court reached no such conclusion. The court said (in its oral decision) in part:

"Mr. Silver had the money to cover the check in the Massachusetts Bank if he chose to do so, and by his own testimony he never intended to cover that check, he never intended to make good the money that was given to him on the 29th. As far as I can tell, unless possibly the garnished funds were not released, if somebody was going to bear the brunt, that was not going to be Mr. Robert Silver.

". . . . . . . . . . . . . . . . . .

"I think that he did have the intention, I think that by circumstantial evidence he has demonstrated that he did have the intention to defraud E. F. Hutton on the 29th when he obtained the money against the check which by that time he knew was not going to be honored. Whether he intended to eventually repay or not, I cannot say at this time. Certainly, the action that he took, in the opinion of this Court, satisfied the requirements of requisite code provision and demonstrated, very unfortunately, the requisite of specific intent."

The court made a specific finding that when Silver obtained the $12,606 check from Hutton, he did intend to defraud Hutton. The court made no finding as to whether or not Silver ever intended to repay Hutton. The court's failure to find whether or not Silver intended to repay is understandable. Although Silver testified at trial he intended to

---

[2]This sum apparently represented the amount of the Coolidge Bank check which had been dishonored less credits in the commodities account.

repay, he wrote Hutton a letter refusing to pay, attempting to justify his conduct and demanding $600 more. Even if the court had found that Silver intended to repay Hutton, that finding would not have required acquittal as a matter of law. In *People* v. *Wieger,* 100 Cal. 352 [34 P. 826], Weiger acquired goods from a merchant by means of false representations regarding his financial condition. In defense, he contended that he had an "honest intent" to pay for the goods and believed that he was financially able to do so. The Supreme Court in affirming judgment of conviction said: " 'As was said in *State* v. *Thatcher,* 35 N.J.L. 445: "The defendant's ability or his ultimate intention to do what the law would compel him as the principal debtor to do cannot save him." And the language of the supreme court of Massachusetts is equally explicit: "The intent to defraud is the intent by the use of such false means to induce another to part with his possession and confide it to defendant, when he would not otherwise have done so. Neither the promise to repay, nor the intention to do so, will deprive the false and fraudulent act in obtaining it of its criminality." (*Commonwealth* v. *Coe,* 115 Mass. 481; *Commonwealth* v. *Mason,* 105 Mass. 163; 7 Am. Rep. 507.) "The offense is complete when the property or money has been obtained by such means, and would not be purged by subsequent restoration or repayment. Evidence of the ability to make the repayment is therefore immaterial and inadmissible. The possession of the means of payment is entirely consistent with the fraud charged." ' " (See also *People* v. *Hansen,* 84 Cal. 291 [24 P. 117].)

In *People* v. *Felsman,* 257 Cal.App.2d 437 [64 Cal.Rptr. 870], Felsman was convicted of grand theft. He induced his victim, Reiter, to loan him money with false statements regarding his intent to marry her, his financial condition and why he needed the money. Felsman contended that since what he obtained was merely a loan which he intended to repay, he could not be convicted of grand theft. In affirming judgment of conviction, the court said:

"Appellant contends that the evidence does not support his conviction of grand theft.

" 'An information charging grand theft includes the offense of obtaining property by false pretenses' [citation], and a defendant ' "may be convicted of grand theft upon proof of acts establishing embezzlement, larceny, or obtaining money by false pretenses." ' [Citation.] ' "Larceny amounting to grand theft can be committed by trick and device and usually results when the victim of a fraud intends not to pass complete title to his property, but that it shall be applied to a special

purpose while the recipient intends to appropriate it to his own use." '
[Citation], quoting from *People* v. *Andrews, supra,* p. 638. 'It is well
settled that a loan of money induced by a fraudulent representation that
it will be used for a specific purpose accompanied by an intent to steal
amounts to larceny by trick and device.' [Citation.] 'Neither the promise
to repay, nor the intention to do so, will deprive the false and fraudulent
act in obtaining it of its criminality.' [Citations.] 'The intent to defraud is
a question of fact to be determined from all of the facts and
circumstances of the case.' " (See also *People* v. *Katzman,* 258
Cal.App.2d 777, 790 [66 Cal.Rptr. 319].)

Silver's letter to Hutton dated April 16, 1973, refusing Hutton's
demand to repay the $12,606 and demanding an additional $600 may
have been consistent with his claim that he believed that he had a legal
right to keep the money, but it was certainly inconsistent with his claim
that he intended to repay it.

Even if we were to interpret the evidence in the light most favorable to
Silver (contrary to all applicable rules on appeal) the most charitable
interpretation of his evidence would still require a conclusion that Silver
and Cliffton[3] entered into a conspiracy to commit grand theft from
Hutton, that by means of false representations they tricked Hutton into
making a loan to Silver which Silver intended to repay and which Hutton
would not otherwise have made, and Silver knew that Hutton would not
have made such loan but for such false representations. Under the
foregoing authorities even such an interpretation of the evidence would
support a conclusion of grand theft by Silver. On the contrary,
interpreting the evidence in the light most favorable to respondent (as we
are required to do on appeal, *People* v. *Reilly,* 3 Cal.3d 421 [90 Cal.Rptr.
417, 475 P.2d 649]) there was substantial evidence to support the
trial court's conclusion that at the time Silver obtained the check from
Hutton for $12,606 he then intended to defraud Hutton and that the
subsequent segregation of the money and subsequent alleged intent to
repay even if true were at best afterthoughts. His state of mind at the
time he obtained the $12,606 check from Hutton was that it was better
that Hutton be "screwed" then that he be "screwed" and that Silver was
tired of being the "fuckee" rather than the "fuckor." It is difficult to
imagine more colorful language to describe a fraudulent state of mind.
Subsequent restitution prior to indictment if interpreted most favorably
to Silver was at most merely evidence of Silver's state of mind at the time
the check for $12,606 was obtained from Hutton. The court was required

---

[3]Under Cliffton's testimony which the trial court believed he was guilty of no
wrongdoing. By making this assumption, we do not mean to imply otherwise.

to weigh that evidence together with all other evidence. Such restitution did not compel a conclusion as a matter of law to the exclusion of all other evidence that the check for $12,606 had not been obtained with intent to defraud. Silver was allowed to produce all available evidence regarding restitution. The trier of fact was not persuaded.

■ Silver claims that when he acquired the check for $12,606 from Hutton on March 29, 1973, he did so in the honest belief that he had a legal right to the money (which belonged to his wife) and in an honest belief that Hutton had no right to withhold the money from him because of the garnishment. It should be borne in mind that we are talking about a contractual relationship between Hutton and Silver. We are not talking about tangible, personal property in the possession of Hutton. Silver therefore was not taking his "property" in the sense of specific tangible property like an automobile. He was at best collecting a "debt."

Silver relies on such cases as *People* v. *Butler,* 65 Cal.2d 569 [55 Cal.Rptr. 511, 421, P.2d 703], wherein the court stated: "The taking of property is not theft in the absence of an intent to steal." " . . . a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent." The vice of this argument is that the trier of fact did not believe Silver's testimony that his conduct was motivated by a belief that he had a right or claim to.the property taken. In its oral decision the court said: "I do feel that credibility is *the* problem in this case." (Italics ours.) The court said, "I think that he did have the intention . . . to defraud E. F. Hutton on the 29th when he obtained the money against the check which by that time he knew was not going to be honored." There is no basis whatsoever for concluding that the trial court believed Silver when he testified he only took what he believed he was entitled to.

The evidence is clear and without conflict that Hutton would never have released the garnished funds voluntarily without the consent of the creditor, and thereby expose itself to liability to Silver's creditor, unless it had been the victim of false representation and trickery. Hutton had a legal right not to be deprived of $12,606 without its informed consent until the controversy between Silver and his creditors was finally resolved. The court could properly conclude that Silver, as a lawyer, was well aware of Hutton's legal rights and that his claim that he believed that he was only taking his own property was an after the fact attempt to justify conduct which he knew was unlawful. The court characterized Silver's testimony as an attempt to "rationalize." Silver tricked Hutton into releasing the money when otherwise it would not have done so. The

court could properly conclude that Silver, as a lawyer, knew that he was legally required to await judicial adjudication in his favor. The third party claim of Mrs. Silver was eventually denied. The court could conclude that, as a lawyer, Silver was chargeable with knowledge that the third party claim might be denied and that until it was adjudicated favorably and finally he had no legal or moral right to the money. The trial court had the right to disbelieve Silver's belated claims to the contrary. We conclude that it did so and we are bound by that factual determination.

■ Before us, counsel argued that he has recently discovered that for various stated reasons the writ of garnishment was void. If so, such alleged fact would not be relevant absent evidence that such fact figured in Silver's state of mind on March 29, 1973. Silver did not mention such alleged fact in any of his conversations with Hutton or in his testimony in the trial court.

■ What we have already said applies with equal force to Silver's claim that he segregated the money and never used it for his own use and benefit. Since he claimed the money was not his but belonged to Mrs. Silver, his failure to use it was merely consistent with her rights. At best, such subsequent segregation and subsequent nonuse was only part of the evidence of the state of mind with which Silver acquired the money. (*People* v. *Katzman*, 258 Cal.App.2d 777, 790, 791 [66 Cal.Rptr. 319]; *People* v. *Crowder*, 126 Cal.App.2d 578 [272 P.2d 775].) Such evidence did not compel a conclusion as a matter of law that at the time Silver acquired the money, he had no intent to defraud. His oral declarations, alluded to above, which were nearly contemporaneous with the act of obtaining the money were obviously far more persuasive as evidence of his then true state of mind.

■ Lastly, we consider Silver's claim that his acquittal on count I (issuing check, etc.) was res judicata on the issue of his guilt on count II (grand theft, etc.). We do not agree. The court gave Silver the benefit of reasonable doubt on count I. The offense alleged in count I would have been complete, if committed, on March 27, 1973, when the check on the Coolidge Bank was delivered to Hutton with intent to defraud. If on that date and at that time Silver had no intent to defraud Hutton, he was not guilty on count I. The court concluded that the intent to defraud was formed in the mind of Silver after March 27, 1973, and on or before March 29, 1973, when he obtained and cashed the $12,606 check from Hutton. (*People* v. *Freedman*, 111 Cal.App.2d 611, 614 [245 P.2d 45].) There was substantial evidence to justify such distinction. It was not until

March 28, 1973, that Schechter (Hutton's New York counsel) indicated to Silver that he was not impressed with Silver's arguments expounding reasons why Hutton should release moneys under garnishment and make a return to the writ that Hutton was not indebted. The trial court could have concluded that until Silver thus learned from Schechter on March 28, 1973, that Hutton would not release the money under garnishment, Silver might well have intended to make his Coolidge Bank check good, but when he received adverse word from Schechter, Silver began to consider how to get money from Hutton and decided to stop payment on the Coolidge Bank check. In fact Silver, in effect, so testified. In his letter to Hutton, Silver said that he sent the stop payment letter to the Coolidge Bank after talking to Schechter on March 28, 1973, and he testified that he sent the stop payment letter to the Coolidge Bank on March 29, 1973. Silver testified that when he gave Hutton the check on the Coolidge Bank on March 27, 1973, he knew that there was a zero balance in the account, but he had issued the check on an out-of-state bank because he knew that the "float time of an unlocal check is considerably longer than a local check" and that it would not clear for several days, that he "thought that sufficient time would rise so that the garnished funds could be released," and that Cliffton "indicated that it was just a matter of a day or so or days and the money would be released." Silver testified directly that he 'expected to use the moneys which he expected to be released under the writ of garnishment to make the Coolidge Bank check good. As noted, Silver claimed that Cliffton originated the idea of creating a debt balance in the Silver account so that Hutton could offset the debt which Silver owed Hutton against the moneys which Hutton held under the writ of garnishment and that he (Silver) agreed to the plan before he received the Hutton check. That debt could be created only if the Coolidge Bank check was no good and if Silver cashed the Hutton check. The court could infer from Silver's testimony that the idea of stopping payment on the Coolidge Bank check originated in the mind of Silver before he received and cashed Hutton's check for $12,606 on March 29, 1973. Silver's problem was that Cliffton denied that he was a party to any such plan or scheme, denied even knowing that there was any such rule of law which gave a broker a right of offset and the trier of fact believed Cliffton and not Silver. Silver admitted that he told Cliffton on Monday, April 2, 1973, that he had stopped payment on the check. The trial court could therefore conclude that there was thus an inconsistency in the testimony of Silver. There was no need for Silver to give Cliffton information on April 2, which Cliffton originated and already knew on March 29. On March 29, when Silver represented that the Coolidge Bank check was good (according to the testimony of Cliffton) he then knew that Schechter would not release the moneys under garnishment and that

he could not rely on such moneys to make the Coolidge Bank check good. He knew at that point that he was guilty of a false representation to Hutton. Under examination by the court, Silver admitted that the $10,606 cashier's check which the Crocker Bank had issued in part payment of the Hutton $12,606 check was cashed promptly on Friday, March 30, 1973. Silver testified that the reason for cashing the Crocker Bank cashier's check so promptly was a fear that Hutton might give instructions to the Crocker Bank to dishonor its own cashier's check. That admission was in conflict with Silver's claim that Hutton had agreed to the arrangement in order to provide a broker's offset against the writ of garnishment and justified an inference that the claim was untrue.

As we have noted, the evidence was in direct conflict in many critical areas. The legal issue of res judicata ends when we find, as we do, that there was substantial evidence to raise a reasonable doubt that the intent to defraud Hutton did not arise in the mind of Silver until after he issued the Coolidge Bank check in the sum of $13,500 to Hutton on March 27, 1973, and before he received and cashed Hutton's check for $12,606 on March 29, 1973. Since there was substantial evidence to support that conclusion, the acquittal on count I was not res judicata on count II and the judgment was not legally inconsistent.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied May 19, 1975.