[No. A045715. First Dist., Div. Three. Apr. 12, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE NAPOLEON SANTAMARIA, Defendant and Appellant.

[No. A050223. First Dist., Div. Three. Apr. 12, 1991.]

In re JOSE NAPOLEON SANTAMARIA on Habeas Corpus.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

Lawrence A. Gibbs, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STRANKMAN, J.—Appellant Jose Napoleon Santamaria was convicted by a jury of first degree murder and robbery. (Pen. Code, §§ 187, 211.)[1] The jury found a robbery-murder special circumstance allegation to be true (§ 190.2, subd. (a)(17)(i)); it also found not true a personal knife use enhancement allegation (§ 12022, subd. (b)). Appellant has appealed from the judgment and has also filed a petition for writ of habeas corpus which has been consolidated with the appeal.

We have concluded that the trial court committed reversible error when it adjourned jury deliberations for 11 days without good cause, despite both the availability of an alternative to interrupting the deliberations and the prejudice to appellant inherent in the timing and duration of the adjournment in this particular case. Because we reverse the judgment, we dismiss the habeas corpus petition as moot.

I. *Evidence at Trial*

On August 31, 1985, Victor Guadron withdrew about $1,500 from the bank, in preparation for an upcoming trip to El Salvador; he displayed the cash to several people.

Guadron never took his trip. Only a few days later, at about 2 p.m. on September 5, his body was discovered in Moss Beach. He had been stabbed several times; tire marks on his body indicated that he had also been run over more than once. His neck was discolored and his larynx broken, an injury commonly seen in strangulation cases. Light bands of skin color on his wrist and fingers suggested that he had been wearing rings, a watch, and perhaps a bracelet, all of which had been removed. His blood-alcohol level when he died was .33 percent.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

The circumstances of Guadron's death were described by Anthony Nubla, who had previously pled guilty to being an accessory to the murder and agreed to cooperate with the prosecution. During the summer of 1985, Nubla had worked at Thrifty Rent-A-Car in San Francisco with appellant, who was Guadron's distant cousin.

On the morning of September 5, appellant telephoned Nubla and promised to pay a $200 debt if Nubla would pick up appellant and Guadron, whom appellant called his "uncle." When Nubla picked up the two men, Guadron sat in the front passenger seat; appellant sat behind him. Appellant directed Nubla to the Pacific Bell office; Nubla double-parked and Guadron went in to pay his phone bill. While Guadron was inside, appellant said he was going to kill Guadron, but Nubla did not think appellant was serious.

After Guadron returned to the car, Nubla drove to Dolores Park to buy marijuana. When they got to the park, Nubla parked, left the car, and headed toward a few marijuana dealers, the only people he saw in the park. He heard someone yelling "Help" in English. He turned around and saw appellant hugging the neck of Guadron and stabbing him.

Nubla ran back toward the car and asked, "what's wrong, what's wrong?" Appellant replied, "let's drive, let's drive, let's go." Nubla was planning to take Guadron to the hospital but appellant directed him down the highway toward Pacifica. As they drove, appellant tilted Guadron's seat so that he was lying down flat; appellant also took Guadron's jewelry and his money. Eventually appellant had Nubla stop; with Nubla's help, appellant pulled Guadron out of the car. Appellant then took the wheel and drove over Guadron's body two times, saying, "I am sorry, uncle."

Appellant and Nubla returned to appellant's house, where they cleaned the blood from Nubla's car; appellant gave Nubla $200 of Guadron's money. About a week later, appellant came to Nubla's house and asked to borrow his license, because appellant wanted to pawn the jewelry, but Nubla refused. Nevertheless, Nubla went with appellant to a pawnshop where no agreement was reached about price. Then they went to the house of Nubla's friend, Danny Fiel. While appellant waited in the car, Nubla tried to sell the jewelry to Fiel, but he did not have any money.

Nubla then offered Danny's brother, Bert Fiel, $20 to help him and appellant pawn the jewelry. Nubla testified that he and appellant picked up Bert and went to two pawnshops; eventually they pawned the jewelry with Bert signing the receipt. Bert took $20; appellant took the rest. Bert testified that Nubla asked to borrow his identification for $25; using Bert's

identification, they pawned the jewelry for about $175. Although Nubla testified that he told Bert that there was a murder "involved [on]" the jewelry, Bert testified that he was told nothing about the killing before the jewelry was pawned; he claimed he did not ask why Nubla was selling the jewelry or where it came from.

In May 1987, police had Nubla arrange to meet appellant. They told him what to say and equipped him with a transmitter. Nubla had two conversations with appellant, both of which were recorded; the tapes were played for the jury, and transcripts of the tapes were also provided. Appellant did not explicitly admit his involvement in the murder during these conversations, but they were incriminating nonetheless. For example, during one conversation, Nubla said, "Man, you the one who did it, bro . . . ." The transcript indicates that appellant replied, "Shhhh, Shhh . . . ."[2] Appellant also told Nubla how to get out of the country; when Nubla insisted that he needed $100, appellant said, "Week, man. Hey."

Appellant's defense was alibi. At about 1 p.m. on September 5, appellant drove a friend to her work to pick up a paycheck. They came back to her home, and appellant spent the rest of the day watching television and drinking beer. The next day, appellant heard from his grandmother that Guadron was dead.

Appellant claimed that Nubla borrowed appellant's car for a couple of hours on September 13. Eventually, Nubla told appellant that he had used the car to take a man named Bert to a pawnshop, so Bert could sell some jewelry he had obtained from a robbery. Appellant knew about Bert, because on September 12, Bert had tried to sell him some jewelry, which appellant recognized as Guadron's. Appellant denied ever having Guadron's jewelry or trying to pawn it; he said he loved Guadron, and denied killing him.

## II. *Adjournment of Jury Deliberations*

 We first consider appellant's contention that the trial court committed prejudicial error when it suspended jury deliberations for 11 days.

### a. *Procedural Background*

Jury deliberations began on the 14th day of trial, February 9, 1989, at 4:19 p.m; at 4:32 p.m., the proceedings were adjourned for the day. The jury

---

[2] Whether appellant said, "Shhhh, Shhh," or whether the sound was interference on the tape was disputed at trial.

deliberated again on February 10, but did not reach a verdict; that afternoon, the court admonished the jury not to discuss the case with anyone and adjourned for 11 days, until February 21. Deliberations resumed on that date. At 9:20 a.m. the instructions were sent to the jury at their request. Later, the jury sent a question to the court; the court and counsel conferred, and the court referred the jury to the instructions that had been provided. Following a brief morning recess and a lunch recess, the jury reached a verdict at approximately 2:30 p.m.

After the jury was excused, the following exchange occurred concerning the interrupted deliberations:

"[Prosecutor]: There are one or two things that I want to put on record.

"The court: Do either of you want to try to talk to the jury?

"[Defense counsel]: I prefer to have it put on the record and—

"The court: All right. Go ahead.

"[Prosecutor]: I wanted to place on the record, Your Honor, my recollection of a discussion that we had a week ago Friday in chambers and [defense counsel]. I am sure he will correct me if my recollection is not correct, but just for purposes of the record, we had a discussion in chambers a week ago this past Friday . . . February the 10th and we had a discussion about the fact Your Honor was to be away this past week. My recollection is that I made a suggestion that we have another judge preside over the jury deliberations during Your Honor's absence, and that [defense counsel] did not expressly state a position on it, but indicated that he believed it might be inappropriate to have another judge preside over the jury deliberations in Your Honor's absence. And at any rate, Your Honor made the decision that the deliberations would be recessed. That is my recollection of the discussion.

"[Defense counsel]: I don't believe I made any comment about the inappropriateness of anything. I think the only thing I mentioned was the existence of section 1053 of the Penal Code which seems to apply to such a matter.

"The court: I had indicated when the jury was being selected, I had indicated to them that they would be off that [particular] week, that being the week of the 13th of February. And that they could count on that as one of the times that [we] would not be in session. [¶] I had also checked with one of the alternate jurors that particular day to see if he recalled that and he vividly recalled it. [¶] I also had received a note from the jury asking me

if they'd be off that week also prior to meeting with counsel in chambers. [¶] And they were aware obviously of the indication and I indicated to them they would be off that week and thus we were so. [¶] So with that let us refer the matter to probation . . . ."[3]

b. *Discussion*

Penal Code section 1121 governs jury sequestration and separation in criminal trials. Until 1969, that section read in pertinent part: "The jurors . . . may, at any time before the submission of the cause to the jury, . . . be permitted to separate or be kept in charge of a proper officer. . . ." Under that version of the statute, a trial court had no authority to permit a separation of the jury after deliberation commenced. Any such separation, even with the consent of counsel, raised a presumption of prejudice; the People had the burden to rebut the presumption with evidence that during the separation, the jurors did not discuss the case and were not subjected to any improper influence. (*People* v. *Hawley* (1896) 111 Cal. 78, 85 [43 P. 404]; *In re Winchester* (1960) 53 Cal.2d 528, 534-535 [2 Cal.Rptr. 296, 348 P.2d 904]; *People* v. *Werwee* (1952) 112 Cal.App.2d 494, 496-499 [246 P.2d 704].)

As amended in 1969, section 1121 now vests the trial court with discretion to allow jurors to separate even after the cause is submitted.[4] (*People* v. *Chain* (1971) 22 Cal.App.3d 493, 497 [99 Cal.Rptr. 472]; see *People* v. *Hernandez* (1988) 47 Cal.3d 315, 338, and fn. 8 [253 Cal.Rptr. 199, 763 P.2d 1289].) Thus, a court has discretion to allow a deliberating jury to separate not just overnight, but over a weekend, provided the customary admonitions are given. (*People* v. *Murphy* (1973) 35 Cal.App.3d 905, 933 [111 Cal.Rptr. 295].) One court has also held that a defendant who does not object in the trial court to suspending deliberations cannot raise the issue for the first time on appeal. (*People* v. *Harris* (1977) 73 Cal.App.3d 76, 83 [140 Cal.Rptr. 697] [five-day holiday weekend].)

Nevertheless, the court's discretion under section 1121 is not without limits. "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (*People* v. *Russel* (1968) 69 Cal.2d 187, 195 [70

---

[3] Before the jury was selected, the court told the panel that Monday, February 13, was a holiday and that court would not be in session during that week, and that Monday, February 20, was also a holiday.

[4] Section 1121 now provides in relevant part: "The jurors . . . may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. Where the jurors are permitted to separate, the court shall properly admonish them . . . ." (Stats. 1969, ch. 520, § 1, p. 1131.)

Cal.Rptr. 210, 443 P.2d 794].) A trial court abuses its discretion when it exceeds the bounds of reason, all of the circumstances before it being considered. (*Id.*, at p. 194.)

■ Here, we must decide whether the court exceeded the bounds of reason when it suspended jury deliberations not just overnight or over a weekend, but for 11 days. We begin our analysis with general principles governing all continuances in criminal trials. The People, the defendant, the victims, and the witnesses all have an explicit statutory right to an "expeditious disposition" of a criminal case. (§ 1050, subd. (a); *People* v. *Ruiz* (1988) 44 Cal.3d 589, 617 [244 Cal.Rptr. 200, 749 P.2d 854].) "[T]o that end it shall be the duty of all courts . . . to expedite these proceedings to the greatest degree that is consistent with the ends of justice." (§ 1050, subd. (a).) ■ Therefore, continuances are to be granted only for "good cause." (§ 1050, subd. (e).)

Although most cases exploring what constitutes good cause involve continuances requested by a party, the good cause requirement is equally applicable to a midtrial continuance or delay occasioned by the trial court itself. Just as the court cannot grant a party's motion to continue without a showing of good cause, it cannot order a continuance on its own motion without good cause. In *People* v. *Gopal* (1985) 171 Cal.App.3d 524 [217 Cal.Rptr. 487], for example, two lengthy continuances interrupting a trial were caused by the trial judge's conflicting responsibilities as presiding judge of the court. This court perceived good cause for the continuances in congested court conditions attributable to "exceptional circumstances." (*Id.*, at pp. 544-546; see also *People* v. *Ruiz, supra,* 44 Cal.3d at p. 617 [trial court's separate administrative responsibilities justified holding trial three and one-half days each week rather than five].) But in another case, the trial judge's appointment to attend a conference did not constitute good cause for a 10-day continuance. The appellate court admonished sharply, "The court's schedule . . . is an insufficient excuse for delay. [Citations.]" (*People* v. *Katzman* (1968) 258 Cal.App.2d 777, 789 [66 Cal.Rptr. 319] [disapproved on other grounds in *Rhinehart* v. *Municipal Court* (1984) 35 Cal.3d 772, 777-780, and fn. 11 (200 Cal.Rptr. 916, 677 P.2d 1206)].)

■ The record in the present case discloses no administrative duties, congested calendar, or any other exceptional circumstances to explain the continuance; instead, the record indicates only that the judge was to be "away," and that at least two of the days involved were holidays. If there was any established necessity for the delay, it is not apparent from this record.

This absence of good cause is not our only concern; both the timing and duration of the continuance are particularly troublesome. A long

adjournment of deliberations risks prejudice to the defendant both from the possibility that jurors might discuss the case with outsiders at this critical point in the proceedings, and from the possibility that their recollections of the evidence, the arguments, and the court's instructions may become dulled or confused. (See *United States* v. *Stratton* (2d Cir. 1985) 779 F.2d 820, 832; see also *People* v. *Valles* (1979) 24 Cal.3d 121, 131 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116] (dis. opn. of Mosk, J.): "[A] fair jury trial can be achieved only if the jury is insulated from outside communications or influences.") Obviously, the longer the separation, the greater the risk. A long adjournment of deliberations also disrupts the very process and pattern of the jury's orderly examination of the evidence. The People cite no case in which an interruption of jury deliberations of such length has been countenanced in a criminal case, and our own independent research has not uncovered any similar case. (See generally, Annot., Separation of Jury in Criminal Case After Submission of Cause—Modern Cases (1976) 72 A.L.R.3d 248; Annot., Propriety and Prejudicial Effect of Court-Authorized Separation of Jury in Federal Criminal Case—(1970) 4 A.L.R.Fed. 310.)

Another factor influencing our assessment of the court's action is the existence of an alternative to suspending deliberations. The trial court here might have utilized the procedure set forth in section 1053, which authorizes the substitution of one judge for another under certain circumstances in criminal cases.[5] (See *People* v. *Duke* (1969) 276 Cal.App.2d 630, 634-635 [81 Cal.Rptr. 69]; *People* v. *Lichenstein* (1913) 22 Cal.App. 592, 609-614 [135 P. 692].) Although the prosecutor suggested a substituted judge and the record before us indicates that appellant did not object to the suggestion, the record is absolutely silent about the court's reasons for rejecting the section 1053 procedure.[6]

To summarize, appellant was faced with a serious charge, a special circumstances first degree murder. The risk of prejudice inherent in suspending deliberations for 11 days was considerable, from the prolonged exposure

---

[5] Section 1053 provides in pertinent part, "If after the commencement of the trial of a criminal action or proceeding in any court the judge . . . presiding at such trial shall die, become ill, or for any other reason be unable to proceed with the trial, any other judge or justice of the court in which the trial is proceeding may proceed with and finish the trial . . . . The judge . . . authorized by the provision of this section to proceed with and complete the trial shall have the same power, authority and jurisdiction as if the trial had been commenced before such judge or justice."

[6] The court did mention that it had already told the prospective jurors that proceedings would not be held during the week of February 13. What those remarks indicate, however, is even before the trial began, the court knew of the possibility that it might not be able to complete the trial because of its plans; the remarks do not explain why the court did not consider the section 1053 procedure from the outset.

of the jurors to outside influences, from the strong probability that their recollections of the evidence and the instructions would fade or become confused, and from the subversion of the pattern of orderly deliberation. The record is devoid of any good cause for the delay, and section 1053 provided an alternative. Under these circumstances, the only conclusion possible is that the trial court exceeded the bounds of reason and abused its discretion with this inordinate interruption in deliberations.[7]

■ The more difficult question is whether the court's error was so egregious that it requires reversal. We have already explained that under pre-1969 sequestration rules, prejudice was presumed from a separation after submission, no matter how brief, and the burden was on the prosecutor to rebut that presumption. (*In re Winchester, supra,* 53 Cal.2d at pp. 534-535; *People v. Werwee, supra,* 112 Cal.App.2d at p. 496.) At the same time, however, courts required a defendant to show prejudice from the separation of a jury during a continuance before submission, and would not reverse based only on speculation about detriment from the delay. (See, e.g., *People v. Erno* (1925) 195 Cal. 272, 282-283 [232 P. 710] [speculation that jury might have been exposed to undue influence from press insufficient to satisfy defendant's burden to show prejudice from 10-day adjournment before submission; nothing in record shows how continuance resulted in detriment to defendant or prevented a fair trial]; *People v. Katzman, supra,* 258 Cal.App.2d at pp. 789-790 [10-day predeliberation continuance had no apparent effect on trial, and defendant's speculation that jury engaged in misconduct during the delay was "pure speculation"]; *People v. Moore* (1962) 209 Cal.App.2d 345, 352-353 [26 Cal.Rptr. 36] [jury permitted to separate from Thursday night until Monday morning after argument but before instruction; court had discretion to permit separation and defendant failed to show prejudice].)

■ When a statute is amended which has been the subject of judicial construction, it is presumed that the Legislature was fully aware of that construction; when substantial changes are made in the statute, an intent to alter the law in those particulars affected by the changes can be inferred. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P2d 1155].) When the Legislature amended section 1121 to make sequestration discretionary both before and after submission, it can be inferred that the Legislature also

---

[7]Two weeks after oral argument, the Attorney General sought permission to vacate submission of the cause, augment the record with declarations, and file a supplemental brief, to argue for the first time that appellant waived the jury adjournment issue by not objecting below. We have denied this belated request; the court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant.

intended to eliminate the presumption of prejudice from every postsubmission separation, no matter how slight, and to require a defendant seeking reversal to establish prejudice from any separation.[8]

■ But the United States Supreme Court has consistently recognized that at times a procedure used by the state is so inherently suspect that a showing of actual prejudice is not a prerequisite to reversal. (See, e.g., *Estes* v. *Texas* (1965) 381 U.S. 532, 543-544 [14 L.Ed.2d 543, 551, 85 S.Ct. 1628] [televising of trial required reversal even if defendant "cannot put his finger on its specific mischief and prove with particularity wherein he was prejudiced"]; *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 351-352 [16 L.Ed.2d 600, 613-614, 86 S.Ct. 1507] [pretrial publicity]; *Turner* v. *Louisiana* (1965) 379 U.S. 466, 473 [13 L.Ed.2d 424, 429, 85 S.Ct. 546] [same deputies used as jury custodians and prosecution witnesses].) The California Supreme Court has also acknowledged this fundamental principle, stating that "the very character of certain procedures [makes] it impractical to establish the degrees of prejudice which [have] resulted therefrom. [Citation.] In these circumstances the defendant need not show that he was *actually* prejudiced during his trial in order to establish a denial of due process of law; it is enough if he can show there was a reasonable *probability* of prejudice. [Citations.]" (*Gordon* v. *Justice Court* (1974) 12 Cal.3d 323, 329 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551].)

Guided by this principle, the court in *People* v. *Engleman* (1981) 116 Cal.App.3d Supp. 14 [172 Cal.Rptr. 474] concluded that the improper grant of a continuance was "inherently prejudicial" and compelled reversal. In *Engleman*, which has recently been cited with apparent approval by the Supreme Court in *People* v. *Ruiz, supra*, 44 Cal.3d at page 617, the dispute involved a three-week continuance granted by the trial court for its own scheduling reasons after the People rested. The reviewing court commented that the court could have utilized the section 1053 procedure for a

---

[8]That interpretation of legislative intent appears consistent with how other jurisdictions analyze claims that the jury should not have been permitted to separate after submission. Generally, where separation is unauthorized either by case law, statute, or rule, prejudice to the defendant will be presumed, and it is the prosecutor's burden to prove that defendant was not prejudiced; in a few such jurisdictions, the error is reversible per se. On the other hand, where the court has discretion to allow that separation, usually the burden is on the defendant to prove actual prejudice. (See generally 4 Wharton's Criminal Procedure (12th ed. 1976) § 552, p. 52; LaFave & Israel, Criminal Procedure (1985) The Criminal Trial, § 23.7, p. 890; Annot., Separation of Jury in Criminal Case After Submission of Cause—Modern Cases, *supra*, 72 A.L.R.3d, § 2, at p. 252; Annot., Propriety and Prejudicial Effect of Court-Authorized Separation of Jury in Federal Criminal Case, *supra*, 4 A.L.R.Fed., § 5, at pp. 324-325.) But the rule requiring a defendant to prove prejudice from a separation is not without exception. (See *Hughes* v. *State* (Del. 1981) 437 A.2d 559, 578-579 [even though court has discretion to permit separation, under certain circumstances, possible prejudice to a defendant may be sufficient to compel reversal].)

substitute judge; it then reasoned that because the delay came before the defendant had the opportunity to introduce his evidence, the jury was left with a one-sided presentation for three weeks, which may have made keeping an open mind impossible and which may have resulted in the jury deciding the case before hearing both sides. The court concluded, "We hold that this was inherently prejudicial to defendant's receiving a fair trial, even though it is hard to demonstrate what effect this delay had on the jurors' thought processes." (*People* v. *Engleman, supra*, at pp. Supp. 20-21.) Under certain circumstances, then, presumptions and burdens of proof concerning prejudice are simply not helpful; instead, a reviewing court's assessment of all the relevant factors, including constitutional due process standards, may lead to the conclusion that an improperly granted continuance compels reversal, even though the defendant cannot show actual prejudice.

Commonly adjournments, even during deliberations, are necessitated by weekends, holidays, sick jurors, or other imperative factors. Most such adjournments are clearly within the acceptable range of a trial court's discretion. Only occasionally will circumstances such as here presented cause an appellate court to review an adjournment. In this case we have concluded that the unexplained adjournment not only constitutes an abuse of discretion; it also mandates reversal.

It cannot be overemphasized that this prolonged and unwarranted interruption came at the most critical period in the trial. The prosecutor and appellant had presented their evidence and argued its significance; the court had instructed on the legal principles to be applied. The case was in the hands of the jury, which had begun its vital task of considering the government's charges against appellant and determining his guilt or innocence of a special circumstance first degree murder. "Due process requires that the accused receive a trial by an impartial jury free from outside influences." (*Sheppard* v. *Maxwell, supra*, 384 U.S. at p. 362 [16 L.Ed.2d at p. 620].) We believe that at no time is it more essential that the jury should be immunized from such influences than when it is deliberating on its verdict. Furthermore, the trial court has a major responsibility to see that a defendant receives a trial consistent with the requirements of due process. (See *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 555 [49 L.Ed.2d 683, 695, 96 S.Ct. 2791].) Here, however, instead of fulfilling its responsibility, the trial court acted to undermine due process requirements by releasing the jurors into the community for 11 days.

A lengthy interruption of deliberations was particularly inappropriate in this case. The trial was not over quickly; testimony began on January 19, took 12 days to present, and was not completed until February 7. The prosecution presented at least 25 witnesses, the defendant, 7. The

proceedings were complicated by the need for interpreters for several of the witnesses, who spoke either Tagalog or Spanish. Approximately 60 exhibits were introduced, including several tapes and transcripts of out-of-court interviews, statements, and conversations. Appellant's alibi defense focused heavily on inconsistencies in the statements of prosecution witnesses and required close attention to all the evidence.

Had the adjournment occurred in midtrial, counsels' recapitulation of the evidence during argument might have nullified or minimized the effect of the delay on the jurors' recall. Because the prolonged interruption at issue occurred after argument and during deliberations, common sense and experience tell us that the delay undoubtedly had some significant effect on jurors' ability to remember complicated facts, as well as on their recall and understanding of instructions. It would be virtually impossible, however, for appellant or anyone else to prove that effect. Common sense and experience also tell us that the jurors undoubtedly came into contact with many people during the lengthy adjournment. Again, however, requiring appellant to prove whether any juror improperly engaged in any discussion of the merits of the case during that time would present an impossible task. "[W]hen there has been a prolonged separation interrupting deliberations, during which the jurors move about at will, silence or oral statements of jurors that they have not discussed the case or have not been guilty of other misconduct may be 'a mere formality, and not capable of refutation by the accused.' [Citation.]" (*Hughes* v. *State, supra,* 437 A.2d at p. 577.)

Contrary to those who consider the doctrine of harmless error abhorrent, this panel agrees with Justice Learned Hand, who observed, "No judge in so extended a trial can avoid on occasion rulings that on reflection he will see to have been wrong; but, unless they cut off some really substantial aspect of the truth, or let in too distracting issues, they are not important." (*United States* v. *White* (2d Cir. 1941) 124 F.2d 181, 186.) But the error in this case does not consist of the admission or exclusion of bits of evidence; rather, it affects the dynamics of the legal process itself. Jury deliberations are a unique exercise in decisionmaking, in which a collective exchange among virtual strangers produces individual decisions which coalesce into a verdict. The dynamics of deliberation are complex and delicate. Jurors are expected to engage in a thoughtful, meticulous, and systematic examination of the evidence; they should not be asked to accomplish this serious task hindered by unnecessary interruption. The deleterious effects of an undue and prolonged gap in deliberations may be difficult to quantify, but their existence cannot be doubted. When issues of liberty are at stake, all sides are entitled as far as practicable to the undisturbed focused attention of the jury.

█ Due process implies an adherence by the trial court to the established mode of trial. Extreme variations from that practice, especially without established necessity, subvert the integrity of the legal process. Pondered experience has perfected the form of the American jury trial. That experience dictated a sequestered jury in this state until 1969. █ Although a trial judge now has a measure of discretion to allow separation for good cause and for the convenience of the jurors, the court in this case exceeded that measure. The 11-day continuance granted without established necessity far exceeds the limits of experience, reason, and most importantly, due process. After evaluating all the circumstances, we cannot say under any standard that the error was harmless. The judgment must be reversed.

### III. *Ineffective Assistance of Counsel**

. . . . . . . . . . . . . . . . . . . .

### IV. *Disposition*

The judgment is reversed; the petition for habeas corpus is dismissed as moot.

White, P. J., and Chin, J., concurred.

A petition for a rehearing was denied April 30, 1991, and respondent's petition for review by the Supreme Court was denied July 11, 1991. Lucas, C. J., and Baxter, J., were of the opinion that the petition should be granted.

.

---

*See footnote, *ante,* page 269.