Jerry WOOLUM, M.D., Individually; Woolum & Combs–Woolum, P.S.C., Appellants,

v.

Lisa Ann HILLMAN, as Administratrix of the Estate of Caitlynn Hillman, Deceased; Lisa Ann Hillman, as Surviving Parent of Caitlynn Hillman, Deceased; Aaron Hillman, as Surviving Parent of Caitlynn Hillman, Deceased, Appellees.

No. 2008–SC–000396–DG.

Supreme Court of Kentucky.

Oct. 21, 2010.

Richard Paul Schiller, Jr., Kimberley S. Naber, Schiller, Osbourn, Barnes & Maloney, Gerald R. Toner, Katherine K. Vesely, O'Bryan, Brown & Toner, PLLC, Louisville, KY, for appellants.

Stephen M. O'Brien, III, Bruce Clark Batten, II, Garmer & O'Brien, LLP, Lexington, KY, for appellees.

Opinion of the Court by Justice NOBLE.

Appellees, Lisa Ann and Aaron Hillman, received a judgment in Bell Circuit Court in their wrongful death action for the death of their stillborn child against Appellant Dr. Jerry Woolum and his medical practice.[1] Appellant challenges the judg-

---

1. The Appellees brought suit as surviving parents. Lisa Ann Hillman also sued as the administratrix of the decedent's estate. Re-

gardless of how the Appellees, as the plaintiffs, were named, Kentucky law recognizes a cause of action by the parents for negligence

ment on four grounds: two evidentiary admissions, the denial of a directed verdict, and juror misconduct. This Court finds no reversible error, and the judgment is affirmed.

## I. Background

In this wrongful death action over a stillborn fetus, Appellees alleged medical malpractice against Appellant for his treatment of the pregnancy after the mother, Lisa Hillman, was diagnosed with pregnancy-induced hypertension (also known as preeclampsia).

As of July 11, 2002, everything appeared normal with the pregnancy, according to an ultrasound performed on that date. At that time, Appellant set the due date as September 16.

When Lisa Hillman attended her regularly scheduled appointment on August 7, 2002, she learned she had a heightened blood pressure reading of 140/100. Appellant diagnosed Hillman's condition as pregnancy-induced hypertension. He informed her that her condition was dangerous and could lead to toxemia and seizures, and instructed her to stay on bed rest and visit him biweekly or immediately if she noticed any problems. Nonetheless, Appellant decided not to advance the due date to before 37 weeks.

Over the next few weeks, Hillman's condition worsened. Eventually, Appellant and Hillman agreed to deliver the child on September 3, almost two weeks sooner than the original due date. During the night of September 2, before the scheduled appointment, Hillman went into labor. However, after she checked into the hospital, nurses could not find a heartbeat from the child. The child was then delivered

resulting in the death of a viable fetus. *See Rice v. Rizk,* 453 S.W.2d 732 (Ky.1970).

stillborn. Appellant did not recommend an autopsy, but he concluded that the child had been dead for at least 24 hours. He told the Appellees at that time that the cause of death was Hillman's preeclampsia, although at trial he offered an alternative theory of a genetic disorder.

Appellees filed their wrongful death action against Appellant in Bell Circuit Court. Their theory of the case was that Appellant committed medical malpractice by postponing delivery after Hillman had been diagnosed with pregnancy-induced hypertension. Appellant countered that the cause of death was a genetic disease, trophoblasts, which affected the placenta and which was untreatable by Appellant.

In a 9–3 verdict, the Bell County jury found for Appellees, awarding them $500,600 in damages. A new trial was then ordered on a matter unrelated to this appeal. However, after the parties reached a settlement on that matter, the court entered a final judgment, which was subsequently appealed.

The Court of Appeals affirmed on all issues implicating liability: two claims of evidentiary error, Appellant's motion for a directed verdict, and his claim of juror misconduct.[2] This Court granted further review on those issues.

## II. Analysis

Appellant raises four issues in his appeal. His primary argument is that testimony about a defense witness's commonality of insurance with the defendant (Appellant) was impermissibly admitted at trial. He also argues that the trial court erred in permitting an ultrasound of the fetus to be played for the jury unaccompanied by expert explanation. Ap-

**2.** The Court of Appeals reversed on issues related to damages but those are not before this Court.

pellant also claims he was entitled to a directed verdict due to insufficient evidence that the fetus was viable in the first place. Finally he alleges juror misconduct arising from two jurors being taken to the hospital in the midst of the trial.

### A. Commonality of Insurance

■ Appellant filed a pretrial motion in limine to exclude evidence that Appellant and his expert witness, Dr. Butcher, shared a malpractice insurance carrier. Appellees sought to admit the evidence to demonstrate the expert witness's bias in favor of Appellant. Appellees argued that Dr. Butcher was biased by their commonality of insurance because he believed that a judgment against his insurance company could adversely affect his own premiums.

In making this claim, Appellees relied on Dr. Butcher's deposition testimony. When previously deposed, Dr. Butcher had described how several malpractice claims against his former liability insurer had driven up his premiums and eventually drove the insurer into bankruptcy, effectively forcing him out of practice in Mississippi. Regarding his new practice in Kentucky, he had stated that doctors were now leaving the Commonwealth because of malpractice claims resulting in increased premiums.

After an extensive hearing, the court denied the motion in limine. The morning before the expert was to testify, the court returned to the matter and again denied the motion in limine and then permitted evidence of the common insurance coverage to be introduced at trial.

■ It is well-recognized that evidence of a defendant's insurance is inadmissible to imply liability. As provided in KRE 411, "Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person

acted negligently or otherwise wrongfully." Under this rule, a doctor's malpractice insurance may not be introduced to suggest that, because he would not bear the burden of any damage to a patient, he was more likely to be negligent in his treatment. The rule is not, however, a complete bar on evidence of liability insurance. The remainder of KRE 411 explicitly instructs, "This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or *bias or prejudice of a witness.*" (Emphasis added.)

Evidence of commonality of insurance was thus clearly not barred by KRE 411 when offered to prove a witness's bias. That was the purpose for which it was offered and that is the purpose for which the trial court allowed it. While the weight of such evidence is debatable, and is indeed case-specific as will be discussed below, it must certainly pass the relaxed test for relevance under KRE 401. A juror might reasonably find it more likely that the expert would be biased in favor of Appellant having the same insurance coverage than if they did not. *See* KRE 401.

■ Yet this does not end the inquiry as to admissibility of such evidence. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice. . . ." KRE 403. The very existence of KRE 411 demonstrates a concern that proof of a defendant's liability insurance inherently creates the danger of undue prejudice. There is always the danger that a jury will show less sympathy to an insured defendant, inappropriately resulting in a verdict for the plaintiff. The question presented in this case is whether that danger in admitting Appellant's and his expert's shared insurance coverage

substantially outweighed its probative value.

The only bright-line solution to this problem has been developed by the Supreme Court of Ohio, which employs versions of Rules 403 and 411 identical to Kentucky's. That court has conclusively held that "in a medical malpractice action, evidence of a commonality of insurance interests between a defendant and an expert witness is sufficiently probative of the expert's bias as to clearly outweigh any potential prejudice evidence of insurance might cause." *Ede v. Atrium S. OB–GYN*, 71 Ohio St.3d 124, 642 N.E.2d 365, 368 (1994); *see also Davis v. Immediate Medical Servs.*, 80 Ohio St.3d 10, 684 N.E.2d 292, 297 (1997). The Ohio Supreme Court drew from the general truth-seeking nature of the rules of evidence, along with the specific exception for bias under Rule 411, in creating its bright-line rule favoring the inclusion of such evidence. *See Ede*, 642 N.E.2d at 368.

Ohio's formation of a bright-line rule rests on two vital principles: the general inclusionary thrust of the Rules of Evidence and the preference for allowing evidence for bias. These are core principles of Kentucky's evidence law also. *See Baker v. Kammerer*, 187 S.W.3d 292, 296 (Ky. 2006) (noting significance of "the general inclusionary thrust of the Rules of Evidence and the more particular preference to allow evidence of bias"). Nevertheless, this Court finds a bright line rule on admissibility of common insurance to be incompatible with KRE 403.

Ohio's approach disregards the role of judicial discretion under Rule 403, which is the same in both Ohio and Kentucky. The dissent in *Ede* noted this and correctly emphasized the role of judicial discretion in balancing probative value against prejudicial effect:

In applying Evid.R. 403, a trial court must have broad discretion because of the practical problems inherent in the balancing of tangible and indefinable factors, such as unfair prejudice and probative value. The task of assessing potential prejudice is one for which a trial judge, in light of his familiarity with all the evidence in a particular case, is well suited. Unlike reviewing judges who must look at a cold record, a trial judge is in a superior position to evaluate the impact of the evidence because he sees the mannerisms and reactions of the jurors, witnesses, parties, and attorneys.

*Ede*, 642 N.E.2d at 370 (Wright, J., dissenting).

The *Ede* dissent echoes this Court's own implementation of judicial discretion in a similar insurance-bias case, *Baker v. Kammerer*. In *Baker*, the plaintiff attempted to reveal a defense witness's employment with the defendant's insurance company. This Court "recognize[d] the trial court's inherent discretion over evidentiary questions such as this one," 187 S.W.3d at 296, and then stated:

Because a multitude of factors may be considered by a trial judge addressing such an issue, judges are free to consider a spectrum of potential remedies. In an appropriate case, a judge might reasonably conclude that insurance evidence should be freely admitted. Another judge might choose a middle ground, allowing the identification of a witness as an agent of the defendant, but refusing to allow the disclosure that a defendant is insured. Likewise, applying the balancing test of KRE 403 might lead to the conclusion that certain insurance evidence is inadmissible.

*Id.* We concluded by rejecting a "rigid, *per se* exclusion of any evidence of insurance" in favor of "the flexible, case-by-case

approach required by KRE 403." *Id.* at 297.

Appellant principally bases his argument on the Court of Appeals' decision in *Wallace v. Leedhanachoke,* 949 S.W.2d 624 (Ky.App.1996). In *Wallace,* the expert and the defendant shared an insurance company, but the plaintiff could not supply the trial court with any hint of bias stemming from that relationship. *Id.* at 625–26. The trial court excluded evidence of the shared insurance because any bias inherent therein was too remote and speculative to outweigh its prejudicial effect. *Id.* at 628. The court stated it was "not prepared to adopt a *per se* rule either permitting or prohibiting this line of cross-examination," and affirmed the trial court's exercise of discretion. *Id.*

■ Appellant urges this Court to adopt and directly apply *Wallace* to hold that evidence of insurance should have been excluded in this case as well. While willing to adopt the well-reasoned analysis in *Wallace,* this Court disagrees with Appellant that its disposition controls the outcome here. Although the facts of both cases are indeed similar, *Wallace* does not provide a per se rule that evidence of shared insurance should be excluded. *See id.* On the contrary, it vests the trial judge with broad discretion to evaluate the proof of bias on a case-by-case basis. *See id.*

When the trial court in this case addressed the matter a second time, the morning before the evidence was introduced, it listed several factors that swayed it toward admitting the commonality of insurance evidence. Those factors, paraphrased, were as follows:

(1) Dr. Butcher unequivocally stated in his deposition that he is of the belief and opinion that malpractice cases result in, and have a direct link to, rate increases;

(2) Dr. Butcher left one state because he believed there was collusion between judges and lawyers in malpractice cases;

(3) Dr. Butcher's comments were so severe during his deposition that defense counsel felt the need to rein him in and caution him;

(4) Dr. Butcher has established a general hostility to medical negligence cases;

(5) Dr. Woolum and Dr. Butcher have more than simply the casual connection of having the same insurance company, as they had worked side by side for twenty years in the same community hospital.

In factoring these considerations into its estimation of probative value, the trial court properly exercised its discretion under KRE 403. Admittedly, as Appellant contends, these factors indicate bias on their own, isolated from the issue of common insurance. Notwithstanding this independent impeachment value, these factors also develop a link between the shared insurance and Dr. Butcher's bias against this malpractice claim. They demonstrate that Dr. Butcher is no average, passive policyholder, but instead a practitioner very concerned with the affairs of his insurer. *See Wallace,* 949 S.W.2d at 626 (recognizing distinction between mere policyholder and someone actively interested in his insurer's affairs).

Based on these factors, the court made the following finding about Dr. Butcher upon first considering the issue:

I wish it could be avoided, but I think they can get in under the bias exception. If they're both insured—I mean he's clearly got a perceived financial stake in the outcome of this trial if they're insured by the [same insurance company]—based on his testimony in his deposition. He obviously believes that lawsuits are the—are what are

pushing his premiums up. It's obvious perceived bias.

When the court returned to the matter during trial and reiterated its ruling, it stated:

He's indicated a strong belief that—and I think that should be the focus of the review, not—not the actual statistical analysis of what malpractice verdicts do to rates, but what the witness believes in his mind. I think that's the key here. The fact that he believes there is a direct link.

?The court's finding that Dr. Butcher had perceived bias is reviewed only for clear error. CR 52.01; *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky.2004). From the factors duly considered, this Court cannot deduce clear error in the lower court's determination.

"As noted above, dual concerns—the general inclusionary thrust of the Rules of Evidence and the more particular preference to allow evidence of bias—weigh heavily in favor of admissibility." *Baker*, 187 S.W.3d at 294. A situation such as *Wallace*, where there is absolutely no evidence linking common insurance to witness bias, is the exception, not the rule. *See id.* at 296. "Absent unusual circumstances wherein the evidence would be ... minimally probative, the principal question is the scope of the evidence of bias to be allowed," not its "initial admissibility." *Id.* In this case, the scope of such evidence consisted of only two questions. The trial court appropriately exercised its discretion by including this evidence of bias.

It is important to note that Dr. Butcher's trial testimony about his insurance carrier and his belief in the effect of the litigation on his premiums is immaterial to the analysis of whether such questioning should have been permitted. The questioning proceeded as follows: ·

Q: Now, you and Dr. Woolum share the same insurance carrier, correct?

A. He has the same one that I have.

Q: And what happens in this case to Dr. Woolum you believe will have some impact or may have some impact on your insurance premium, don't you, sir?

A: No. With his denial of any impact, all questioning about their common insurance ceased.

That Dr. Butcher actually testified that this malpractice claim would not impact his insurance premiums cannot retroactively control the trial court's KRE 403 balancing, which was done in response to a motion in limine resolved prior to trial and based on deposition testimony. If the trial court had been presented at the hearing on the motion in limine with evidence that Dr. Butcher did not think this litigation would impact his insurance premiums—e.g., in his deposition testimony—it would have weighed heavily in favor of excluding the commonality of insurance. Even then, the trial court would not have been bound by Dr. Butcher's claim and could consider his other testimony that evidenced bias.

As a result of the strong connection between common insurance and witness bias, it was not an abuse of discretion to admit the evidence.

### B. Ultrasound

■ A second motion in limine by Appellant sought to exclude an ultrasound of the fetus during pregnancy. The motion was denied and, when Lisa Hillman took the stand, a video of the ultrasound was played for the jury. Appellant contends the ultrasound was not properly authenticated by Hillman and also that it unduly prejudiced Appellant by its presentation.

Appellant never challenged the authenticity of the ultrasound at trial. His mo-

tion in limine instead focused purely on the relevance and prejudice of the ultrasound. When Appellees attempted to introduce the ultrasound at trial, Appellant simply "renewed" his objection to its probative value. Thus, the issue of authentication was not properly raised and is unpreserved for Appellate review. Consequently, Appellant cannot now claim that Hillman was an improper witness through whom to authenticate and introduce the ultrasound.

■ Turning to Appellant's second contention, it is essentially an argument under KRE 403: he asserts the ultrasound had minimal probative value and whatever value it did have was substantially outweighed by its prejudicial effect. This contention was properly preserved through Appellant's motion in limine.

Appellant is correct that the ultrasound carries minimal probative weight. The only relevant fact the ultrasound tends to show is that the fetus was living at the time the ultrasound was performed. (Even this observation may not be obvious to a juror unfamiliar with ultrasounds.) Although the ultrasound may tend to prove the fetus was then alive, this does not impute great probative value, as that fact was not disputed at trial. Furthermore, to the extent that the ultrasound demonstrates life in the fetus, that proof is simply redundant to the ultrasound report, which was admitted for the same purpose.

Despite the minimal probative value, this Court cannot say it was an abuse of discretion to admit the ultrasound in light of its similarly minimal countervailing prejudicial effect. As Appellant described the video of the ultrasound in his original motion in limine, it "shows nothing other than a *purely objective and scientific* procedure already documented by the ultrasound report." (Emphasis added.)

Appellant's assertion of the unfair prejudice deriving from the ultrasound is as follows: "[B]y showing the jury this video of an approximately seven-month-old fetus, the jury was left with the impression that in one moment everything was O.K. with the mother and baby, and then *all of a sudden*, everything was not O.K." (Emphasis in original.)

This Court finds both of Appellant's fears assumed in this statement to be misguided. First, as Appellant himself admits, "Due to the jury's lack of knowledge of ultrasound imaging, the video had no tendency to make the existence of any consequential [and disputed] fact (e.g., the health of the fetus and whether or not it had a genetic defect) more or less probable." Thus, while the ultrasound tends to show that the fetus was alive, it does nothing to leave the impression that "everything was O.K. with the mother and baby."

Even more far-fetched is Appellant's assumption that the ultrasound left the jury with the impression that, "*all of a sudden*, everything was not O.K." Obviously, the presentation of the ultrasound in no way suggests what occurred following the ultrasound procedure. At least to a lay observer, the ultrasound is equally consistent with the fetus developing problems due to a genetically defected placenta, as due to preeclampsia. Neither signs of a genetic defect, or the lack thereof, nor signs of preeclampsia, or the lack thereof, are apparent from the ultrasound. In light of its minimal prejudicial effect, it was not an abuse of discretion to admit the ultrasound into evidence.

## C.  Sufficiency of the Evidence

■ Appellant's third contention is that Appellees presented insufficient evidence that the fetus was viable and, therefore, Appellant was entitled to a directed verdict.

However, Appellees did present expert testimony that a fetus delivered at 31 weeks—the point at which Appellant discovered Hillman's high blood pressure—could survive. Specifically, Dr. Fields, an obstetrician and gynecologist, testified that on August 7, Hillman was approximately 31 weeks pregnant. According to Dr. Fields, "If you deliver that baby at 31 weeks, its statistics are overwhelmingly in favor of its survival and its survival intact." Dr. Fields also testified that his opinion was based on a reasonable degree of medical certainty.

Appellant urges that such expert testimony was insufficient in light of allegedly contradictory testimony about the serious health risks to a child born prior to 37 weeks of pregnancy. These two assertions are not contradictory. The fact that a baby might be subject to major health risks does not necessarily make it unviable. "[T]he expression 'viable fetus' means the baby has reached such a state of development that it can presently live outside the female body as well as within it." *Mitchell v. Couch*, 285 S.W.2d 901, 905 (Ky.1955). Viability is not a guarantee that baby will live outside the womb; it is only a claim that the fetus has developed sufficiently that it is possible to survive. An unhealthy baby may still be a viable one.

Viability would only be undercut by testimony of certain death resulting from a premature birth. No such testimony was offered here. Even if it had, the Appellees offered testimony to the contrary, which would have been sufficient to avoid a directed verdict. Similarly, even if testimony about health risks that was introduced at trial did contradict other evidence of the viability of the fetus, the controversy would not entitle Appellant to a directed verdict, removing it from the purview of the jury. On the contrary, it is precisely the jury's role to resolve such factual disputes. *Cf. Dixie Ice Cream Co. v. Ravenna Grocery Co.*, 306 Ky. 182, 184, 206 S.W.2d 824, 825 (1947) (jury determines which witnesses' testimony to believe). With direct expert testimony that the fetus was viable, there is no doubt the evidence was sufficient for the jury to conclude the same.

## D. Juror Misconduct

Appellant characterizes his final claim as juror misconduct, although he admits any error was through no fault of the jurors themselves.

During jury deliberations, two jurors became ill, complaining of chest pains and blood pressure spikes. They were sent to the hospital for treatment. Deliberations were postponed for six days until the jurors returned from their treatment.

Appellant actually sets forth two claims of error based on this bizarre incident: that the delay in deliberations is itself grounds for mistrial and that the coincidental onset of juror high blood pressure in a trial about the treatment of high blood pressure biased the jury against Appellant.

### 1. Delay as a Due Process Violation

As to the first point, which is actually a due process claim, an appellant ordinarily must establish prejudice from the delay to obtain a reversal. *See Knuckles v. Commonwealth*, 315 S.W.3d 319, 322 (Ky.2010). There was no indication of actual prejudice here. The court individually questioned each juror whether he or she had been affected in any way by the delay and no problems were reported.

In the absence of proof of actual prejudice, this Court recently enumerated several considerations to help determine whether prejudice should be presumed. *See id.* at 323. Those considerations are

the length of the delay, whether there was a good reason for the delay, whether the trial court properly admonished the jurors against communicating about the case with others prior to the separation, whether the case was so complex that a prolonged interruption would have a significant effect on the jurors' ability to remember complicated facts, whether alternatives to delaying the trial existed, and the extent of publicity surrounding the case.

*Id.*

When applied to the delay at issue here, these considerations support the trial court's decision to deny a mistrial. First, the delay in jury deliberations lasted six days, less than half as long as the fourteen-day delay this Court upheld in *Knuckles*. Second, there was certainly a good reason for the delay when two jurors needed to be hospitalized for treatment. Third, the trial court specifically and repeatedly "admonished the jurors against communicating about the case with others prior to the separation" during the delay. Fourth, this trial did not involve particularly complex factual issues that would easily have been confused after a six-day hiatus. On the contrary, the only real factual dispute revolved around the reasonableness of maintaining a standard delivery schedule in light of heightened blood pressure in the mother. Additionally, the court noted the jurors had taken copious notes during trial and that if any problems recollecting testimony did occur, those notes would be satisfactory to assist them. Fifth, there was no alternative to delaying the trial because a circuit court jury cannot consist of less than twelve jurors absent a stipulation thereto by the parties. *See* Ky. Const. § 248; CR 48. Nothing in the record indicates any offer by the parties to do so. Sixth, the trial court reasonably presumed that there would not be significant publicity surrounding the trial

such that the jurors would be easily solicited. Neither party was a public figure nor was the medical malpractice case one of particularly great public importance.

It is true that "prejudice is much more likely to be presumed where the delay occurs after jury deliberations have begun." *Knuckles*, 315 S.W.3d at 323. That jury deliberations have begun, however, does not require a presumption of prejudice. Only in situations where a long delay occurs for no good reason, does the fact that it came in the midst of jury deliberations caution heavily in favor of a mistrial. *See People v. Santamaria*, 229 Cal.App.3d 269, 280 Cal.Rptr. 43 (1991), *cited with approval in Knuckles*, 315 S.W.3d at 323. Where, as here, all or most of the factors counsel against presuming prejudice, a mistrial should not be ordered regardless of the stage at which the delay occurred.

### 2. Prejudice of the Affected Jurors

Turning to Appellant's second theory of juror misconduct, no bias can be discerned from the coincidental development of high blood pressure among two jurors. It is worth noting that the two jurors to have experienced high blood pressure fell on opposite sides of the verdict. As that split suggests, there is no cause to believe a juror with high blood pressure is more or less sympathetic to a doctor's treatment of high blood pressure during pregnancy.

If suffering from high blood pressure undermined a juror's impartiality in this case, Appellant had the opportunity to identify such biased jurors in voir dire. Not having done so, Appellant cannot fairly attack the impartiality of jurors who develop high blood pressure, or suffer from its symptoms, after the onset of trial. *Cf. Adkins v. Commonwealth*, 96 S.W.3d 779, 795 (Ky.2003) ("A motion to excuse a

juror for cause ordinarily must be made during *voir dire.*"). Appellant has not explained why such jurors would disfavor doctors who treat high blood pressure related to pregnancy or would otherwise unfairly pre-judge the matter.

## III. Conclusion

For the aforementioned reasons, the decision of the Court of Appeals is hereby affirmed.

MINTON, C.J.; ABRAMSON, SCHRODER, SCOTT and VENTERS, JJ., concur. MINTON, C.J., also concurs by separate opinion in which ABRAMSON, J., joins. CUNNINGHAM, J., dissents by separate opinion.

MINTON, C.J., CONCURRING:

I concur in result and with most of the reasoning in the majority opinion, but I write separately to highlight a few key points.

First, I wish to make clear that with very few exceptions introduction of a party's liability insurance coverage is prohibited by Kentucky Rules of Evidence (KRE) 411. And I believe that every effort should be made to reveal witness bias without resorting to introducing evidence of a party's liability insurance coverage. While I wonder if Dr. Butcher's bias here could have been shown without resorting to admitting evidence of Dr. Woolum's liability insurance coverage by the same carrier, I do not believe the trial court's admission of the evidence was an abuse of discretion under the unique facts of this case.

Despite Dr. Butcher's statement at trial that he did not believe this particular lawsuit would affect his own insurance premiums, his deposition testimony could reasonably support a contrary conclusion that he perceived a personal financial stake in the outcome of this case. For example, Dr. Butcher recounted how he was forced to flee another state to escape increased insurance premiums; and he described how insurance premiums had recently increased in Kentucky. He further recounted lawsuits that were filed against him and other doctors, frequently describing particular malpractice lawsuits as "nuisance suits." In particular, the manner in which Dr. Butcher described his personal experiences and expressed opinions could lead to an inference that he generally harbored hostility toward malpractice lawsuits and perceived doctors as being persecuted by exorbitant insurance premiums caused by lawsuits that were almost always frivolous.

Further, I agree with the trial court that the fact that this expert practiced at the same hospital as' Dr. Woolum suggests that this expert might have perceived a personal financial stake in the outcome of this case. It is not clearly beyond the realm of possibility that a malpractice lawsuit filed against a doctor practicing at the same hospital might have a more direct effect on his premiums than other malpractice lawsuits.

Second, I acknowledge Dr. Woolum's allegation that the ultrasound videotape was presented in such a theatrical manner as to heighten its prejudicial effect. Specifically, he asserts that the ultrasound videotape was played while Ms. Hillman occupied the witness stand and wept openly in full view of the jury. Upon review of the record provided us, I would note that Ms. Hillman is not directly visible on the portion of the trial videotape during which the ultrasound videotape was played. But her attorney can be seen handing her a box of tissues and a few soft sniffles can be heard during the playing of the ultrasound videotape.

Directly after the ultrasound videotape presentation, Ms. Hillman resumed her

testimony in a composed manner with no emotional outbursts. Having reviewed this portion of the record, I conclude that although the ultrasound videotape was of dubious probative value, any error in its presentation was harmless given the inherent emotional nature of this case, the apparent lack of truly overwrought emotional display, and the fact that other evidence also established that the fetus was known to be viable with no apparent defects at that point.

Although perhaps the better practice might have been to not admit the ultrasound videotape—as the trial judge later admitted with the benefit of hindsight—the effect of the few minutes of unnarrated ultrasound videotape presentation was unlikely to have had a substantial effect on the judgment following a generally well-managed and fair multi-day trial. So any error was harmless. *See Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009), *citing Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). ("A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error."). *See also* Kentucky Rules of Civil Procedure (CR) 61.01; KRE 103.

I concur with the majority that the opinion of the Court of Appeals affirming the trial court judgment must be affirmed.

ABRAMSON, J., joins.

CUNNINGHAM, J., dissenting:

With great reluctance, and after much soul searching, I dissent.

My reticence in disagreeing with the majority begins with the heart rending plight of the Appellees who are in bad need of closure in this case. However, regardless of this consideration, fairness must be weighed on balanced scales. I am also hesitant to disagree with the very fine scholarship and writing of both Justice Noble, writing for the majority, and Chief Justice Minton in his concurring opinion.

But, at last I dissent because of the six-day delay in the deliberations. With the other close issues discussed by the majority in this case, this interlude in the deliberative process should have ended the trial in a mistrial.

Much emphasis has been placed on the *Knuckles* case in upholding the trial court in this case. That criminal case was much different. It was continued only after one day of trial. Both sides still had the opportunity to shore up their cases to accommodate what damage they may had perceived was brought about due to the delay. Also, in *Knuckles,* the delay was due to the unfortunate events impacting the judge. Here, the cause of the delay impacted the jury. Two jurors—fact-finders and verdict-makers of the case—suffered traumatic physical problems. Both incurred hospital stays. The parties in this case were entitled to a continuous, uninterrupted deliberation by the jury with its members spared of any life-altering experiences being visited upon them. Mistrials are the calamities of trials gone awry. But they have their place. One should have been declared in this case. For that reason, I respectfully and reluctantly dissent from the well-crafted opinion of the majority.